THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v DONALD WYNN, Appellant.

Second Department, November 22, 1976

*Herbert Kramer* for appellant.

*Eugene Gold, District Attorney (Eugene H. Scher* of counsel), for respondent.

MARGETT, J. This appeal raises the question of what stan-

dards are to be applied in the consideration of a motion to suppress physical evidence where a defendant has been frisked largely upon the basis of information received on a police radio call.

On February 1, 1974, while on a regular tour of duty in a radio patrol car in Brooklyn, Police Officer Anthony Curcio received a call over the police radio stating that "[t]here is a man walking on Nostrand Avenue from a bar, *possibly* armed with a gun" (emphasis supplied). The call specified that the man was near the intersection of Nostrand and Atlantic Avenues and described the person as a male "wearing a white coat with fur trim and black pants." The time of the call was 10:32 P.M. No further description was given—the officer had not been told by the dispatcher anything about the suspect's race, age, height or weight.

The officer and his partner responded, but when their vehicle stalled in traffic, the officer alighted and ran northbound on Nostrand Avenue, a thoroughfare which "runs for miles." There were people on the street, but the appellant was the only pedestrian on one side of the street. The officer first observed him a half block away. The appellant was walking in the officer's direction, wearing a three-quarter length white coat with fur trim and black pants. The appellant did not alter his direction or run. No gun was observed by the officer; not even when he got "very close" to the appellant. Two bars were open on that block at the time.

The appellant was ordered to "freeze" and to "get up against the wall". He was further directed to put his arms up. He offered no resistance. The officer proceeded to "pat" appellant down on both sides of his body and discovered a hard bulge on the right side. The officer unbuttoned the appellant's coat and observed a revolver in a black holster. The revolver was loaded with six rounds of ammunition.

The appellant was charged with the crimes of possession of weapons, etc., as a felony, and criminal possession of a controlled substance in the seventh degree. At a suppression hearing held on October 30, 1974, the sole witness for the People was the arresting officer. He did not know the name of the person who had phoned the police at "911" with the information which was relayed over the police radio. Nor did he know whether the police dispatcher or any other member of the police department knew the informer's name. He did not know the appellant. The appellant's motion to suppress

was denied and, following a plea of guilty to the crime of attempted possession of weapons, etc., as a felony, appellant was sentenced on December 4, 1974. The sole issue raised on this appeal is whether, under the facts of this case, the appellant's motion to suppress was properly denied.

The action taken by the police officer may properly be described as a forcible stop and detention of the appellant. The police officer's actions certainly went beyond the "minimal intrusion of approaching to request information" (see *People v De Bour,* 40 NY2d 210, 223), yet they fell short of a custodial arrest. The officer's actions were virtually identical to those taken by the police in *People v La Pene* (40 NY2d 210), where the defendant was ordered to "freeze" and to raise his hands, and was then frisked for a weapon. Under circumstances such as those, it is unnecessary that the police officer have probable cause to believe that the person is committing a crime; rather, the action is lawful so long as the officer entertains a reasonable suspicion that defendant had committed, was committing, or was about to commit a felony or misdemeanor (see CPL 140.50, subd 1; see, also, *Terry v Ohio,* 392 US 1; *People v Cantor,* 36 NY2d 106).

Since the primary impetus for the police officer's actions herein was a call over the police radio, a two-step analysis must be undertaken in considering the propriety of the forcible stop and detention. Since the sender's knowledge—i.e., that information which is possessed by the police department —is imputed to the receiver *(People v Lypka,* 36 NY2d 210), inquiry should first be had as to the quality of the information possessed by the sender. If the information was sufficient, had it been given first-hand to the police officer, to justify the stop and frisk undertaken, our inquiry is at an end.

However, should the information be insufficient, the focus of inquiry shifts to the receiver of the message. A radio call, standing alone, may not be enough to justify a forcible stop and detention. In the context of *arrests,* an otherwise illegal arrest cannot be insulated from challenge by the decision of the arresting officer to rely on information received from fellow officers *(Whiteley v Warden,* 401 US 560, 568). However, the sort of stop here employed, while a "seizure" of the person (see *Terry v Ohio,* 392 US 1, 19, *supra),* is a more limited intrusion justified by (a) the governmental interest in investigating crime and (b) the more immediate interest of the police officer in taking steps to assure himself that the person

with whom he is dealing is not armed with a weapon which could unexpectedly and fatally be used against him *(Terry v Ohio, supra,* p 23). Therefore, even if the information underlying a radio message would not independently justify a stop, the *nature* of the radio message, or the independent observations of the police officer, might.

Thus, a radio report that a suspect had just used a gun for the commission of a crime might, in and of itself, warrant a stop and frisk, whereas a report that one is in possession of a gun (without more) would not (see *People v Green,* 35 NY2d 193). If the independent observations of the receiver confirm, in important respects, the sender's information, a stop might also be warranted *(People v Lypka,* 36 NY2d 210, 213, n 2, *supra).*[1] Likewise, an officer's independent observations of suspicious conduct (see *People v Peters,* 18 NY2d 238), or a potentially dangerous situation (see *People v De Bour,* 40 NY2d 210, 222, *supra* [where it was noted that the arresting officers did not see a bulge at defendant's waist or any other indication that he was armed]), might warrant a stop and frisk.

In the case at bar, there is no evidence that the sender of the radio call had sufficient information to justify a forcible stop and frisk. The informant was, insofar as the record is concerned, anonymous. The informant apparently communicated to the police over the telephone. Tips of this nature are of the weakest sort, since no one can be held accountable if the information is in fact false (see Penal Law, § 240.50) and there is no way to assure, by way of intangibles such as voice, facial expression or emotional state, that the information was communicated and received accurately and was believable *(People v De Bour,* 40 NY2d 210, 224, *supra).* Even more importantly, the informant said merely that the man described was *"possibly* armed with a gun", without any explanation as to the basis of his belief. Such a report would not, even if communicated in a more direct manner to the police, justify a response of the intensity here present (see *People v Green,* 35 NY2d 193, *supra).*

Nor was there sufficient reason, on the part of the police officer who received the message, to act as aggressively as he did. I reiterate that the receiving officer was told merely that

---

1. Of course, in such an instance, the information relayed must be detailed (e.g., as to dress) and precise (e.g., as to location) (see *Spinelli v United States,* 393 US 410, 417; *People v Castro,* 29 NY2d 324).

the man was *possibly* armed. There was no report that the man *had* a gun, much less any indication that the gun had been used in the commission of a crime. Under these circumstances the governmental interest in investigating crime and the interest of the police officer in self-protection fail to outweigh the constitutionally protected right of our citizens to be free of the "annoying, frightening, and perhaps humiliating experience" of being forced up against a wall and frisked (see *Terry v Ohio*, 392 US 1, 25 *supra).*

Nor did the independent observations of the police officer justify the action taken. I disagree with the conclusion expressed in the dissenting opinion that the description of the suspect was sufficiently "unusual and particular" so that the independent observations of the recipient police officer confirmed the sender's information in important respects. The description transmitted merely specified a man "wearing a white coat with fur trim and black pants." No information was given as to the man's race, age, height or weight. Furthermore, the message indicated that the man was walking on Nostrand Avenue, near the intersection of Atlantic Avenue. Considering the fact that it was a Friday night in the middle of winter, there was nothing unusual about a man wearing a white coat with fur trim and black pants walking down Nostrand Avenue near its intersection with Atlantic Avenue (cf. *Draper v United States,* 358 US 307; see *People v La Pene,* 40 NY2d 210, *supra* [where the police were actually directed to a black man wearing a red shirt in a specific bar]).[2]

Finally, there were no observations by the police officer of suspicious conduct or potential danger. Indeed, when first observed, the appellant was walking in the officer's direction. The appellant never altered his direction and nothing resembling a weapon was observed, even when the officer got "very close" to him.

Accordingly, the suppression motion should have been granted and the judgment of conviction should be reversed and the indictment dismissed.

LATHAM, Acting P. J. (dissenting). I disagree with the majority and vote to affirm the judgment.

In *People v La Pene* (40 NY2d 210), relied upon by the

---

2. Nevertheless, it was there held that the police were without reasonable suspicion to frisk the man. Here, the description was less detailed as to appearance and less precise as to location.

majority, the description given was merely that a black man wearing a red shirt was in a bar. In sharp distinction, in the case at bar, the defendant's garb (i.e., a male wearing a white coat with fur trim and black pants) was unusual and particular and was accurately described in the anonymous report. The defendant's location—walking away from a bar near a particular intersection (i.e., the intersection of Nostrand and Atlantic Avenues)—was also accurately reported and the defendant was apprehended within a block of that intersection and near two bars.

Thus the distinctive attire, the location and the actions of the defendant were accurately reported by the anonymous informant and that information was completely verified by the observations of the officer. The officer then concluded that the person described in the report as being "possibly armed with a gun" represented a potential danger to himself and to all other persons in the area and proceeded to stop and search him. In my judgment, the officer had ample and reasonable cause to do so.

Though the informant was anonymous, this, for obvious protective reasons, is frequently so. In my view the holding of the majority is unrealistic in the climate of today's troubled streets and tends to discourage alert police action and to inhibit citizen participation in the prevention of crime.

RABIN, TITONE and HAWKINS, JJ., concur with MARGETT, J.; LATHAM, Acting P. J., dissents and votes to affirm the judgment, with an opinion.

Judgment reversed, on the law, motion granted, and indictment dismissed. The findings of fact made by Criminal Term are affirmed, save as this court has inferred from those facts that the defendant's garb was not "unusual".