75 N.J. 243 (1977)
381 A.2d 759
STATE OF NEW JERSEY IN THE INTEREST OF H.B., JUVENILE-APPELLANT.
The Supreme Court of New Jersey.
Argued April 26, 1977.
Decided December 2, 1977.
*244 Mr. Thomas A. Pavics, Assistant Deputy Public Defender, argued the cause for appellant (Mr. Stanley C. Van Ness, Public Defender, attorney).
Ms. Patricia J. Arons, Assistant Prosecutor, argued the cause for respondent (Mr. Joseph P. Lordi, Essex County Prosecutor, attorney).
The opinion of the court was delivered by HUGHES, C.J.
The appellant was adjudicated a juvenile delinquent for possession of a revolver in violation of N.J.S.A. 2A:151-41, an offense which, had he been an adult, would have constituted a high misdemeanor. His appeal, here as of right under R. 2:2-1(a)(2), challenges the majority *245 decision of the Appellate Division upholding that adjudication after approving the trial court denial of the motion to suppress evidence on which it depended.
The sound opinion of the majority, which we affirm and specifically adopt and incorporate herein, would ordinarily suffice without more. We deem some added discussion necessary, if only to emphasize the need for a realistic State approach to the dangers presented by the modern proliferation of handguns in the possession of millions of citizens including, of course, many violent criminals. The fact and relevance of this phenomenon were noted by Chief Justice Warren in the landmark case of Terry v. Ohio, 392 U.S. 1, 23-24, 88 S.Ct. 1868, 1881, 20 L.Ed.2d 889, 907 (1968):
American criminals have a long tradition of armed violence, and every year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded. Virtually all of these deaths and a substantial portion of the injuries are inflicted with guns and knives.
Continuing in a footnote, the Chief Justice mentioned:
Fifty-seven law enforcement officers were killed in the line of duty in this country in 1966, bringing the total to 335 for the seven-year period beginning with 1960. Also in 1966, there were 23,851 assaults on police officers, 9,113 of which resulted in injuries to the policemen. Fifty-five of the 57 officers killed in 1966 died from gunshot wounds, 41 of them inflicted by handguns easily secreted about the person. * * * See Federal Bureau of Investigation, Uniform Crime Reports for the United States  1966, at 45-48, 152 and Table 51.
The easy availability of firearms to potential criminals in this country is well known and has provoked much debate. See e.g., President's Commission on Law Enforcement and Administration of Justice, The Challenge of Crime in a Free Society 239-243 (1967). Whatever the merits of gun-control proposals, this fact is relevant to an assessment of the need for some form of self-protective search power. [392 U.S. at 24 n. 21, 88 S.Ct. at 1881, 20 L.Ed.2d at 907].
There are projected to be no less than 40 million handguns in circulation in this country today, with about 2.5 million being added to that pool each year. United States *246 Conference of Mayors, National Forum on Handgun Control Proceedings at 6 (forum in Los Angeles, Ca. May 27-29, 1975).
This volatile mixture, of violence and the surfeit of handguns which is its primary co-efficient, presents much danger to law-abiding society and a particular threat to the uniformed law enforcement community which is so frequently its target. This astounding situation is a factor which cannot be ignored in considering the constitutionality of the police conduct here involved.
The danger is particularly acute in an urban community such as the City of Newark, where this case arose. The Eisenhower Commission found that in large United States cities handguns assisted in 86 percent of all aggravated assaults committed with guns, 92 percent of homicides by gunfire and 96 percent of robberies committed with guns. National Commission on the Causes and Prevention of Violence, To Establish Justice, To Insure Domestic Tranquility xxvi (1969). And while a few states, including New Jersey, have strong and strictly enforced gun control laws, N.J.S.A. 2A:151-32 et seq.; N.J.S.A. 2A:151-41 et seq., their effectiveness is limited because in many states gun controls are virtually non-existent or largely ignored. As of 1971, eight states had no law against felons buying firearms, and in 35 states mentally ill persons could legally own guns. Comment, "Shooting to Kill the Handgun: Time to Martyr Another American `Hero'," 51 J. Urban Law 491, 512 (1974).
New Jersey, highly congested and with its share of crime and its causes, is no stranger to this national malady. Twenty-four police officers were killed by guns in this State during the ten year period ending in 1976. During 1976, there were a record five New Jersey police officers killed and 3,903 assaulted in the line of duty. Of every 100 municipal police officers, 21.5 were assaulted during 1976. New Jersey State Police, Uniform Crime Reports for the State of New Jersey  1976, at iv. The State Police Superintendent reports that since 1971, 21,719 guns have been delivered to him *247 for destruction, by police officials and prosecutors. These weapons were seized as a result of illegal use or possession, the vast majority having been used in the perpetration of a crime.
Such continuing trends would make even more relevant today the prophetic warning of the United States Supreme Court in Terry v. Ohio, supra, dealing with police exposure and apprehension of harm:
We are now concerned with more than the governmental interest in investigating crime; in addition, there is the more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him. Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties. * * *
* * * [W]e cannot blind ourselves to the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest. When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm. [392 U.S. at 23-24, 88 S.Ct. at 1881, 20 L.Ed.2d at 907-08].
The Chief Justice went on to say:
A search for weapons in the absence of probable cause to arrest, however, must, like any other search, be strictly circumscribed by the exigencies which justify its initiation. Warden v. Hayden, 387 U.S. 294, 310, 87 S.Ct. 1642, 1652, 18 L.Ed. 2d 782, 794 (1967) (Mr. Justice Fortas, concurring). Thus it must be limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby, and may realistically be characterized as something less than a "full" search, even though it remains a serious intrusion.
* * * The protective search for weapons * * * constitutes a brief, though far from inconsiderable, intrusion upon the sanctity of the person. It does not follow that because an officer may lawfully arrest a person only when he is apprised of facts sufficient to warrant a belief that the person has committed or is committing a crime, the officer is equally unjustified, absent that kind of evidence, in making any intrusions short of an arrest. Moreover, a perfectly reasonable *248 apprehension of danger may arise long before the officer is possessed of adequate information to justify taking a person into custody for the purpose of prosecuting him for a crime. * * *
Our evaluation of the proper balance that has to be struck * * * leads us to conclude that there must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. [Id. at 25-27, 88 S.Ct. at 1882-83, 20 L.Ed.2d at 908-09 (emphasis added)].
Accepting these rules as representing bedrock constitutional law, it remains to apply them to the factual base as stated by the Appellate Division:
On December 16, 1974 Patrolman Finn of the Newark Police was on duty in a radio car when he received a radio dispatch from police headquarters that a black individual wearing a black hat, black leather coat and checkered pants was in Ray's Luncheonette at 407 South Orange Avenue with a gun in his possession.
Officer Finn and his partner proceeded to the location. As Finn entered the front door he saw approximately 15 persons in the luncheonette. He also observed a black man with a black hat, black leather coat, checkered pants and sneakers seated in a rear booth with three girls.
He thereupon walked up to the booth and told the male occupant, identified as defendant, to stand and put his hands on the wall. Finn then patted him down or frisked him, and as he was doing so he felt an object in the right hand coat pocket which felt like a gun. He reached into the pocket and removed a .32 caliber revolver. [139 N.J. Super. at 465].
We will assume in the absence of evidence to the contrary that the information in the radio dispatch from police headquarters was based upon no more than an anonymous "tip." The record does establish, however, that the description therein of H.B.'s person and clothing was found to be precisely accurate; that none other of the 15 males in the luncheonette was similarly dressed or "fitted the description"; that there was nothing unusual (or suspicious in the Terry sense) in *249 H.B.'s conduct; but that Officer Finn, and presumably his partner, were in full uniform when they entered the premises. We regard this last fact as highly significant to the reasonableness of the conduct of the officers, in view of their exposure to risk in this somewhat crowded place, from a supposed "man with a gun."
The "informer reliability" demanded by Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1968) and Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) is not a prerequisite here. We are not concerned in this case with a "full blown search" as mentioned in the dissent filed in the Appellate Division, but rather with the brief and limited self-protective intrusion described in Terry.
There is some verification factor in the very accuracy of the informer's description. Although the informer in Draper v. United States, 358 U.S. 307, 309, 79 S.Ct. 329, 331, 3 L.Ed.2d 327, 330 (1959), was known and reliable, the Court attached significance to the appearance, at the place predicted, of a "person, having the exact physical attributes and wearing the precise clothing described * * *."
In reaching its conclusion that the limited intrusion in the present case was amply justified, the majority below cited People v. Taggart, 20 N.Y.2d 335, 283 N.Y.S.2d 1, 229 N.E.2d 581 (Ct. App. 1967), appeal dismissed, 392 U.S. 667, 88 S.Ct. 2317, 20 L.Ed.2d 1360 (1968). There the Court of Appeals was dealing with a gun possession case based on a "stop and frisk" by a detective who had been alerted by an anonymous telephone call. The court gave evidential weight to the matching of the description:
As Delaney testified, the description of defendant given to him by the informer matched "perfectly" with his own observations. To that extent, then, the information was correct, and this substantiation justified Delaney's suspicion that the remainder of the information might also be correct. In acting upon this assumption, Delaney was "exercising a reasonable and necessary police power for the prevention of crime and the preservation of the public order"  *250 a power which was recognized at common law * * * [283 N.Y.S.2d at 5, 229 N.E.2d at 584].
The Taggart court believed, as we do in the circumstances of the present case, that "for the police to have ignored the information received is not an acceptable thesis, despite the anonymity and, therefore, the undetermined reliability of the source." 283 N.Y.S.2d at 6, 229 N.E.2d at 584. We think that the police here would have been derelict in the performance of their duties had they not made such a limited weapons search.
Appellant urges that People v. La Pene, 40 N.Y.2d 210, 386 N.Y.S.2d 375, 352 N.E.2d 562 (Ct. App. 1976) and People v. Wynn, 54 A.D.2d 366, 388 N.Y.S.2d 922 (App. Div. 1976), decided subsequent to the decision of the Appellate Division in this case, overrule Taggart sub silentio. We find nothing in either case to warrant rejection of the reasoning in Taggart. The "precipitate frisk" in La Pene was based on information "couched in vague and general terms" (black man in red shirt); no attempt was made to ascertain whether others present fit this description; and the court specifically found no "exigency" justifying a limited protective frisk. In Wynn also the information was ambiguous, concerning a man walking on the street "possibly armed with a gun," there being "no report that the man had a gun." 388 N.Y.S.2d at 925. Although the court in Wynn also noted the absence of any indication that any such gun had been used in the commission of a crime, we specifically reject this factor as not important in the circumstances of the present case, in the face of the handgun crisis we have described and its immediate threat of violence to society in general and to uniformed police officers in particular. We deem La Pene and Wynn of no aid to appellant.
As to People v. Stewart, 41 N.Y.2d 65, 390 N.Y.S.2d 870, 359 N.E.2d 379 (Ct. App. 1976) and People v. McLaurin, 56 A.D.2d 80, 392 N.Y.S.2d 1 (App. Div. 1977), however these cases may be considered as eroding the *251 authority of Taggart, they are yet distinguishable from the facts here, if only because of the comparative vulnerability of the policemen involved, a factor we deem highly relevant to the justification of the police conduct.
The concept of exigency is important in this type of case. As Justice Brennan stated in Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967): "The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would endanger their lives or the lives of others." Id. at 289-90, 87 S.Ct. at 1646, 18 L.Ed.2d at 787.
The thread of logic in these cases projects the element of "reasonableness" as justifying the limited intrusion described by Justice Jacobs for this Court in State v. Dilley, 49 N.J. 460 (1967). He recalled the Terry rationale that "the officer who frisks a person he considers dangerous does so, not because he is seeking evidence, but because he wants to protect himself." Id. at 469.
Reasonable suspicion "involves a significantly lower degree of objective evidentiary justification than does probable cause to arrest." Survey of the 1973 Supreme Court Term, 27 Rutgers L. Rev. 465, 579 (1974). We have no doubt that such degree of reasonable justification existed in the case before us, for we believe with the Appellate Division here that:
Where a weapon or explosive is involved it would be folly to say that the police should be compelled to ignore information, though from an anonymous source, and do nothing to protect the public under penalty of the suppression of evidence if they do what their duty reasonably demands.
By the same token, we intend our decision here, justifying a protective frisk, to be narrow enough to be understood as comprehending only such lethal material, vis-a-vis gambling paraphernalia or narcotic contraband, for instance, although they too would evidence criminal activity. We would not include in the thrust of this opinion material such as *252 the glassine envelopes containing heroin which were discovered in the search dealt with in In re State in the Interest of D.S., 63 N.J. 541 (1973).
To the end of such emphasis we repeat and adopt the language of the Appellate Division:
[T]he principles applied herein are viable only in cases where the frisk or search is essential for the protection of life and limb of the police officer and exposed members of the public. It is this present danger which cloaks such police action with the reasonableness required by the Fourth Amendment.
While this Court has not been reticent in going beyond naked constitutional right as defined by the United States Supreme Court,[1] we think we should not so act in the circumstances here. To do so in the face of the violent climate of the times and the universal threat of handguns, particularly to the policeman as he carries out official duties, would seem foolhardy and wrong, and needlessly expose society and the police community to serious risk of death or injury.
We are therefore content with the sensitive and sensible balancing of constitutional imperatives enunciated by Chief Justice Warren in Terry v. Ohio, supra. We conclude that the police action here was justified and that the motion to suppress was rightly denied.
Affirmed.
MOUNTAIN, J., concurring.
I join in the opinion of Chief Justice Hughes and add some remarks in support of it.
The facts of this case bring it within the important but ill-defined area of law enforcement where an officer encounters *253 a civilian in a public place under circumstances giving rise to reasonably grounded suspicion of criminal activity, but not constituting probable cause to arrest. The question is, what should and what may the officer legally do?
As Chief Justice Warren has pointed out,
Street encounters between citizens and police officers are incredibly rich in diversity. They range from wholly friendly exchanges of pleasantries or mutually useful information to hostile confrontations of armed men involving arrests, or injuries, or loss of life. Moreover, hostile confrontations are not all of a piece. Some of them begin in a friendly enough manner, only to take a different turn upon the injection of some unexpected element into the conversation. [Terry v. Ohio, 392 U.S. 1, 13, 88 S.Ct. 1868, 1875, 20 L.Ed.2d 889, 901 (1968)]
Fully recognizing the diversity of such encounters and the resultant variety of problems they may provoke, it is nevertheless vitally important to lay down guidelines of general applicability to assist law enforcement officers to fulfill their public functions effectively. It is not enough to tell the police what they may not legally do; they should also be told what they legally may do and how they may do it.
An important attempt to aid in this effort was undertaken by the American Law Institute. As the result of continuous work and study commencing in 1963, a committee of distinguished scholars, acting under the sponsorship of the Institute, formulated A Model Code of Pre-Arraignment Procedure (1975). Article 110 of this Code outlines appropriate police conduct in stop-and-frisk situations. Pertinent to the problem are the following provisions:
Section 110.2. Stopping of Persons
(1) Cases in Which Stop is Authorized. A law enforcement officer, lawfully present in any place, may, in the following circumstances, order a person to remain in the officer's presence near such place for such period as is reasonably necessary for the accomplishment of the purposes authorized in the Subsection, but in no case for more than twenty minutes:
(a) Persons in suspicious circumstances relating to certain misdemeanors and felonies.

*254 (i) Such person is observed in circumstances such that the officer reasonably suspects that he has just committed, is committing, or is about to commit a misdemeanor or felony, involving danger of forcible injury to persons or of appropriation of or damage to property, and
(ii) such action is reasonably necessary to obtain or verify the identification of such person, to obtain or verify an account of such person's presence or conduct, or to determine whether to arrest such person.
Section 110.2(4) states:
A law enforcement officer who has stopped any person pursuant to this Section may, if the officer reasonably believes that his safety or the safety of others then present so requires, search for any dangerous weapon by an external patting of such person's outer clothing. If in the course of such search he feels an object which he reasonably believes to be a dangerous weapon, he may take such action as is necessary to examine such object.
The "observation" referred to in the Model Code is not confined to the personal observation of the stopping officer. Here, the radio message describing an individual as armed supplied reasonable grounds for investigation. The stopping officer's observation of an individual corresponding to the radio description, coupled with the information leading to the encounter, was sufficient to arouse reasonable suspicion that the crime charged had been and was being committed. I respectfully submit that the foregoing represents sound, constitutionally permissible doctrine. It would clearly result in justifying the conduct of the officers in the case before us.
Our dissenting colleagues stress the fact that the police based their action here upon an anonymous telephone call rather than upon information received from an informant of known reliability. I submit that this criticism ignores realities. If all reports of crime received by the police under cloak of anonymity are to be disregarded, it will seriously reduce citizen participation in aiding law enforcement. The daily newspapers amply justify our taking judicial notice of prevailing and pervasive citizen reluctance to become involved in bringing criminals to book.
*255 Where, as here, the police receive information from an anonymous source that a particular individual is armed, the police face a difficult choice.[1] If they investigate the information, they must be able to frisk the allegedly armed individual to ensure their safety. Without this protection, their only safe course of action would be to ignore the information, and thus to forfeit the opportunity of forestalling the use of the dangerous weapon.
Courts in other states have approached the problem in a direct and effective fashion. Several jurisdictions have recognized that an anonymous message may justify a stop. See State v. Hobson, 95 Idaho 920, 523 P.2d 523 (Sup. Ct. 1974); People v. Lopez, 52 Cal. App.3d 263, 123 Cal. Rptr. 855 (Dist. Ct. App. 1975); People v. Jeffries, 39 Mich. App. 506, 197 N.W. 2d 903 (Ct. App. 1972); State v. Chatmon, 9 Wash. App. 741, 515 P.2d 530 (Ct. App. 1973). Where the stop is predicated on a reasonable suspicion that the subject is armed, a frisk is also recognized to be proper. The Supreme Court of Illinois, for instance, was faced with a factual situation very like this case in In re Boykin, 39 Ill.2d 617, 237 N.E.2d 460 (1968). There the police were advised by the principal of a high school in Chicago that he had received an anonymous message that a particular student then in the school building was carrying a gun. The student was summoned from the classroom, asked if he were armed, and upon his denial was frisked. The officers felt a gun which was removed. In sustaining the trial court ruling that defendant's motion to suppress should be denied, Justice Schaefer significantly observed,
In this case, moreover, there is a complete absence of any possible element of gain to the anonymous informant from furnishing false information, and the nature of the potential danger differs from *256 that involved in gambling and narcotics cases. [237 N.E.2d at 461-62]
A more recent case from the same jurisdiction resulted in a similar ruling. In People v. McElroy, 44 Ill. App.3d 1047, 3 Ill. Dev. 495, 358 N.E.2d 1180 (App. Ct. 1976) the police received a radio call that a woman with a gun "was in the area of 3816 West Maypole." Upon arriving at the location the officer observed defendant and another woman in the street. The officer instantly determined that defendant, of the two, was more probably armed, because she alone carried a purse. He asked defendant if he might search her purse, giving his reason for wishing to do so. At that point defendant "became hostile" and sought to depart. She was placed under arrest. On the way to the station defendant was asked whether she had a gun in her purse, and she responded affirmatively. The purse was opened and the gun found. Denial of the motion to suppress was affirmed. It will be seen at once that the facts of this case lend much less support to the State's position than is true in the suit before us. Furthermore McElroy involved an arrest, requiring probable cause rather than the reasonable suspicion needed to sustain a frisk. See also Commonwealth v. Anderson, 366 Mass. 394, 318 N.E.2d 834 (Sup. Jud. Ct. 1974) (stop-and-frisk of allegedly armed bus passenger based on anonymous message thrown in to highway toll booth held proper); United States v. Walker, 294 A.2d 376 (D.C. App. 1972), cert. den. 414 U.S. 1007, 94 S.Ct. 368, 38 L.Ed.2d 245 (1973) (stop and frisk based on anonymous tip upheld; police have duty to investigate reports of armed individuals); District of Columbia v. M.E.H., 312 A.2d 561 (D.C. App. 1973) (en banc) (accord).
While the issue before us implicates important Fourth Amendment rights, there must be weighed against these the state's interest in protecting the lives and safety of its citizens. Here pragmatism should prevail over theoretical niceties. The Chief Justice, in his opinion in this case, *257 rightly emphasizes the danger that exists to society because of the widespread possession and use of dangerous weapons, especially firearms. At least where the suspected criminal conduct extends to the illegal possession of dangerous weapons, I would hold that a telephone message, though received from an anonymous informant and therefore unauthenticated as to reliability, is sufficient to justify a stop-and-frisk. This case does not require that we go further.
Justices SULLIVAN and SCHREIBER join in this concurring opinion.
HANDLER, J., dissenting.
The Court has ruled in this case that a private citizen may be subjected to a police frisk solely upon the vague and unsubstantiated accusation of an anonymous telephone caller that at a particular location an unnamed person wearing certain clothing possessed a gun. In holding that a private citizen, in no other way the object of suspicion, may thus be subjected to this kind of intrusion upon his personal privacy, the Court has ventured well beyond the limitations recognized by the United States Supreme Court with respect to the power of police officers to frisk individuals under the Fourth Amendment. The result reached here is not supported by authority and projects a judicial rule which eliminates the long-standing requirement that police, before taking such action, must have a reasonable basis grounded in fact to suspect that the targeted individual is armed and dangerous. I must therefore dissent.
Preliminarily, it is entirely appropriate to assume that the source of information upon which the police action was taken was an anonymous telephone caller. The record shows that the police officers relied solely on a radio communication in making the "stop and frisk." The State offered into evidence as a business record a Motor Patrol Log for that day maintained by Patrolman Finn and his partner, Patrolman Comito, to establish that the officers were dispatched to a luncheonette on a "170", a suspicious person classification. Finn was the only person, however, to testify for the *258 State at the suppression hearing and the trial, and he had no independent knowledge of the source of the radio dispatch. Hence, the origin of the dispatcher's information remains unknown and unproved.
According to Finn, he and Comito were on duty in a patrol car when they received a radio communique from police headquarters reporting that a black individual wearing a black hat, black leather coat and checkered pants had a gun in his possession and was presently at Ray's Luncheonette at 406 South Orange Avenue (sic: 407 South Orange Avenue). The patrolmen drove directly to the location and entered the luncheonette. Approximately fifteen patrons were in the luncheonette. Finn observed the juvenile seated at a booth conversing with three females. The juvenile was the only individual in the luncheonette who fit the description provided in the radio message. Finn immediately approached him, and, after requesting the three females to leave the booth, told the juvenile to stand up and proceeded to frisk him, patting down the exterior of his clothes. Upon feeling an object which felt like a gun, Finn reached inside the juvenile's pocket and found a revolver. H.B. was then arrested.
In sustaining the frisk and seizure on these sparse facts, the majority conceives that it has fashioned a rule which satisfies "* * * the need for a realistic state approach to the dangers presented by the modern proliferation of hand guns in the possession of millions of citizens including, of course, many violent criminals." Ante at 245. The Court relies upon Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) for primary support. That case recognized the right of a police officer to engage in a stop and frisk based upon less than probable cause to arrest in order to neutralize a dangerous situation incident to an investigation. In recognizing this power, the Supreme Court was mindful of the prevalence of violent crime and the inordinate risks to which police officers are daily exposed. It was made very clear in Terry, however, that a stop and frisk for weapons *259 is not a "minor inconvenience and petty indignity" but a search clearly within the meaning of the Fourth Amendment. Id. at 16-17, 88 S.Ct. at 1877, 20 L.Ed.2d at 902-903. The Court showed great circumspection, therefore, in requiring, as a precondition to the exercise of such power, that there be sufficient concrete facts for a police officer to suspect that the situation was dangerous. To justify the intrusion, "* * * the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." (footnote omitted). Id. at 21, 88 S.Ct. at 1880, 20 L.Ed.2d at 906.
In failing to appreciate this aspect of Terry, the majority has miscalculated its authoritative sweep. Unlike the case sub judice, in Terry the police officers directly observed conduct which gave rise to a reasonable suspicion that defendants posed a danger. In this vein, it is well to note that in State v. Dilley, 49 N.J. 460 (1967), mentioned by the majority, Ante at 251, the policemen had also observed "highly suspicious activities" which took place at 3:00 A.M. in a high-crime area. In contrast, the present case does not involve any aberrant behavior on the part of the juvenile. There was simply nothing untoward observed by the police officers with respect to H.B.'s demeanor or conduct when they came upon him that would prompt a reasonable suspicion that he was hostile or dangerous.
In light of this signal difference from Terry  the absence of any suspicious behavior by H.B.  attention must be directed to Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), the first Supreme Court case to uphold a stop and frisk precipitated by an informant's tip. In that case, the stop and frisk occurred at approximately 2:15 A.M. in a high-crime area. The informant was known to the police officer and had supplied information in the past. The tip was apparently given at the scene as a result of direct observations, the informant having told the police officer that a person was in a car nearby with narcotics *260 in his possession and a gun at his waist. There was, in addition, possible furtive or uncooperative conduct by the suspect because when the policeman approached the car, tapped on the window and asked him to get out, defendant did not comply but instead lowered the window, which, the Court thought, increased the threat from a gun. Instantly, the policeman reached into the car and removed a gun from defendant's waistband, though no gun was visible until it was seized.
The stop and frisk in Adams was upheld because the information received from the informant was buttressed by sufficient indicia of reliability and, together with what occurred at the scene, became an adequate basis for the police action taken. Moreover, Adams suggests very strongly that the personal reliability or accountability of the informant remains an important ingredient in the total factual picture presented to the police as a prelude to a stop and frisk. It is undoubtedly this reason which prompted the Supreme Court to observe that, "[t]his is a stronger case than obtains in the case of an anonymous telephone tip." id. at 146, 92 S.Ct. at 1923, 32 L.Ed.2d at 617.
In sharp contrast, the majority eliminates effectively "informer reliability" as a requisite in determining whether the police have reasonable grounds to conduct a stop and frisk. Unlike Adams, there is absent here, obviously, any basis for concluding that the anonymous telephone caller, as an individual, was a person who could be trusted to give accurate or credible information of criminal activity, since he was not known to the police. There was no other circumstance suggesting that the anonymous caller was an ordinary private citizen who assumedly would act out of a sense of concerned duty and for that reason could be trusted. State v. Lakomy, 126 N.J. Super. 430, 435 (App. Div. 1974); State v. Canola, 135 N.J. Super. 224, 229-230 (App. Div.), certif. den. 69 N.J. 82 (1975); State v. Kurland, 130 N.J. Super. 110, 114-115 (App. Div. 1974); see People v. Duren, *261 9 Cal.3d 218, 107 Cal. Rptr. 157, 507 P.2d 1365 (Sup. Ct. 1973). In addition, the tipster in our case was not at the scene when the police arrived or did not show himself, if he was present. The invisible, absent informant was in no way accountable nor could he be made personally responsible for false or misleading information. Adams v. Williams, supra; State v. Lakomy, supra; see People v. Green, 35 N.Y.2d 193, 360 N.Y.S.2d 243, 318 N.E.2d 464 (Ct. App. 1974).
The majority opinion states that "* * * the description [contained in the anonymous `tip'] of H.B.'s person and clothing was found to be precisely accurate * * *" and further that no one else on the scene was similarly dressed or met the description. Ante at 248. The Court considers the "accuracy of the informer's description" to constitute "some verification factor", citing Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959). Ante at 249.
The confirmation of the informant's tip is greatly exaggerated by the majority. There was no precision in the description of the individual. A person is hardly described at all, let alone "precisely", when he is referred to as a black individual. There was nothing exceptional about the clothing. The informant did not relate, for example, the color of the inside lining of the person's coat or that he had a key ring on his belt, something that would not only serve to pinpoint and identify the suspect but would indicate as well that the informant had been in close proximity to the suspect and might well have been in a position to observe a weapon in his possession. Cf. People v. Walker, 64 Mich. App. 138, 235 N.W.2d 85, 88, 89 (Ct. App. 1975).
Draper v. United States, supra, a search and seizure case, is distinguishable. There the details given by the informant were set forth with considerable specificity, including the prediction of an event. Moreover, it was an important fact that the information acted upon by the law enforcement authorities was provided by a reliable and known informant. Thus, the wealth of detail and the occurrence of the predicted event, *262 together with the reliability of the source of the information, constituted in their totality a sufficient basis for believing that the information of criminal activity was trustworthy and believable. State v. Hannah, 125 N.J. Super. 290 (App. Div. 1973), certif. den. 64 N.J. 499 (1974); see State v. D'Orsi, 113 N.J. Super. 527 (App. Div.), certif. den. 58 N.J. 335 (1971); United States v. Mendoza, 547 F.2d 952 (5 Cir.), cert. den. 431 U.S. 956, 97 S.Ct. 2679, 53 L.Ed.2d 273 (1977).
It may be that the so-called "verification factor" can be diluted where there is involved only reasonable suspicion as a basis for a stop and frisk rather than probable cause necessary for a "full blown" search and seizure. Nevertheless, where the only information that is susceptible of corroboration is a vague, physical description of an unnamed and unidentified individual, this alone cannot trigger a stop and frisk. People v. Stewart, 41 N.Y.2d 65, 390 N.Y.S.2d 870, 359 N.E.2d 379 (Ct. App. 1976); People v. La Pene, 40 N.Y.2d 210, 386 N.Y.S.2d 375, 352 N.E.2d 562 (Ct. App. 1976). Descriptive information should be fairly detailed, specific and extensive in order for its corroboration to generate the belief that it is reliable, not only with respect to the identification of the suspect but that he is criminally dangerous. Especially must this be so where there is absolutely no basis for knowing or even surmising that the informant himself is a trustworthy person and there is no other circumstance to impel an independent and reasonable suspicion that the situation is perilous, such as observable, troubling actions by the suspect.
A further ground in support of the Court's conclusion is said to be the "concept of exigency." Ante at 251. Warden v. Hayden, 387 U.S. 294, 89 S.Ct. 1642, 18 L.Ed.2d 782 (1967), a "hot pursuit" case, is cited. The exigency in that case consisted of the lack of opportunity for the police to secure a warrant for a search. But, unlike here, the police were acting directly upon the eye witness accounts given to them in person by individuals who had observed an armed *263 robbery in progress and had seen the felon flee to a particular address. This understanding of exigency has no relation whatsoever to the circumstances presented by this case.
The majority's endorsement of People v. Taggart, 20 N.Y.2d 335, 283 N.Y.S.2d 1, 229 N.E.2d 581, appeal dismissed, 392 U.S. 667, 88 S.Ct. 2317, 20 L.Ed.2d 1360 (1968), is misguided. Taggart is a pre-Terry case which cannot be squared with Adams v. Williams, supra. Its cogency, moreover, is severely undercut by the recent cases, People v. La Pene, supra and People v. Wynn, 54 A.D.2d 366, 388 N.Y.S.2d 922 (App. Div. 1976), which the majority here discounts as "of no aid to appellant", (Ante at 250, and People v. Stewart, supra, and People v. McLaurin, 56 A.D.2d 80, 392 N.Y.S. 2d 1 (App. Div. 1977).
The majority seems to feel that these recent New York cases are different from ours because, for example, in La Pene the anonymous information was "`* * * couched in vague and general terms' (black man in red shirt) * * *" and defendant "fit this description"; and in Wynn the information was "* * * ambiguous, concerning a man walking on the street `possibly armed with a gun * * *'." Ante at 250. This attempted distinction, however, is artificial. In La Pene, the court characterized the description as unspecific and insufficient and ruled that this information, as well as the observations of the officers which failed to reveal any suggestive criminal activity, did not justify a reasonable suspicion that defendant unlawfully possessed a concealed handgun. Wynn is a comparable decision.
The demise of Taggart in its own jurisdiction is further underscored by Stewart and McLaurin. In Stewart, police officers engaged in a stop and frisk based solely upon a radio message that a male "with a gun", described as a Negro wearing a long green coat, was at a particular location. In suppressing the evidence, the court relied specifically on La Pene, which, according to the unanimous Stewart court, established the proposition that "* * * an anonymous phone tip giving a general description and location of a `man *264 with a gun' * * * will not of itself constitute reasonable suspicion thereby warranting a stop and frisk of anyone who happens to fit that description." (citations omitted). Stewart, supra, 41 N.Y.2d at 69, 390 N.Y.S.2d at 873, 359 N.E.2d at 382. Compare Stewart with People v. Williams, 41 N.Y.2d 65, 390 N.Y.S.2d 870, 359 N.E.2d 379 (Ct. App. 1976) (companion case) (suspect was actually named by the anonymous informant and was known to the police officer). McLaurin follows specifically La Pene and Stewart.
These cases; La Pene, Wynn, Stewart and McLaurin, like the one under consideration, each involved an anonymous informant, whose personal trustworthiness and veracity, actual or assumed, in no way could be depended upon. The descriptions of the alleged culprits consisted simply of a few generalized physical characteristics, not so extensive, unique or detailed that their corroboration would justify a belief that the information, including particularly the ultimate accusation of the possession of a weapon, was more likely than not to be true. And in none of these situations, including the one presented to us, did the suspect do anything witnessed by the police officers to suggest the likelihood of an aggressive criminal act.
In its reliance upon Taggart, the majority reiterates the statement in that decision to the effect that police would be derelict to ignore even anonymous telephone information of undetermined reliability in investigating and frisking a suspect. Ante at 250. But it is not a complete answer on a motion to suppress evidence as seized in violation of the Fourth Amendment to assert that a police officer patrolling the streets must react promptly to a radio dispatch involving a suspicious person. Common sense, practicality and good judgment require an officer to respond swiftly to orders from headquarters and not delay taking effective investigatory and needed preventive measures. The concern from a constitutional vantage point, however, is not so much whether the officer on the scene is acting sensibly in the situation confronting him, but whether the State, through its law enforcement *265 machinery, under the totality of circumstances presented to it, has acted reasonably in authorizing the police action, be it a search and seizure or a stop and frisk of a citizen.
Although an individual policeman may rely on the strength of a radio bulletin, the radio dispatch cannot be used to shield police action from constitutional challenge. An otherwise invalid Fourth Amendment intrusion upon an individual cannot be cleansed merely by radioing a policeman on patrol to accomplish what the dispatcher or desk officer on the information available to him could not do directly. Whiteley v. Warden, 401 U.S. 560, 568, 91 S.Ct. 1031, 1037, 28 L.Ed.2d 306, 313 (1971). The police action must be assessed for reasonableness in constitutional terms by reference to the sum total of the information and knowledge available to the police collectively and not by the isolated or selective consideration of only a part of the total composite bearing upon the existence of reasonable suspicion or probable cause, as the case may be. Id.; People v. La Pene, supra; United States v. Robinson, 536 F.2d 1298 (9 Cir.1976).
It does not appear that the result reached in this case can claim support in any other jurisdiction. In the District of Columbia, for example, courts have gone quite far to sustain seizures resulting from a stop and frisk based upon information of questionable or attenuated reliability. Still, these stop and frisk cases have usually involved an unidentified informant who had no apparent motive to lie and who related the information to the police officer in person under circumstances indicating that he himself had observed the particular suspect. E.g., United States v. Walker, 294 A.2d 376 (D.C. App. 1972), cert. den. 414 U.S. 1007, 94 S.Ct. 368, 38 L.Ed.2d 245 (1973); District of Columbia v. M.E.H., 312 A.2d 561 (D.C. App. 1973) (en banc); Gaskins v. United States, 262 A.2d 810 (D.C. App. 1970); United States v. Frye, 271 A.2d 788, 790 (D.C. App. 1970) (albeit citing People v. Taggart, supra); see, Galloway v. United States, 326 A.2d 803 (D.C. App. 1974), cert. den. *266 421 U.S. 979, 95 S.Ct. 1981, 44 L.Ed.2d 471 (1975) (probable cause for search and seizure). The approach reflected in these decisions is not dissimilar to State v. Lakomy, supra, which recognized that information reported in person by a private citizen relative to the possession of a dangerous weapon could serve as an adequate basis for police engaging in a stop and frisk incidental to their investigation of the complaint.
Other jurisdictions which have considered the issue of the adequacy of a tip as to the possession of a dangerous weapon from either an anonymous telephone caller or an unidentified informant have ruled a stop and frisk based on that alone would not be justified. E.g., Price v. State, 37 Md. App. 248 (Ct. Spec. App. 1977). Commonwealth v. Cruse, 236 Pa. Super. 85, 344 A.2d 532 (Super. Ct. 1975); Jackson v. State, 157 Ind. App. 662, 301 N.E.2d 370 (1973); see Ballou v. Commonwealth, 403 F.2d 982 (1 Cir.), cert. den. 394 U.S. 909, 89 S.Ct. 1024, 22 L.Ed.2d 222 (1969). And some courts have recognized that while an anonymous tip might call for an investigation and a "stop", in the absence of added factors it would not justify a "frisk" of the individual. People v. Lopez, 52 Cal. App.3d 263, 123 Cal. Rptr. 855 (Dist. Ct. App. 1975); People v. Jeffries, 39 Mich. App. 506, 197 N.W.2d 903 (Ct. App. 1972) (defendant was not frisked until after the police asked him to identify himself and inquired about the gun which he admitted possessing); compare State v. Hobson, 95 Idaho 920, 523 P.2d 523 (Sup. Ct. 1974).
The majority pays homage to the standard of reasonableness expressed in State v. Dilley, supra. That case upheld the right of a police officer "* * * to stop persons on the street for summary inquiry where * * * the circumstances are * * * highly suspicious." Dilley, supra, 49 N.J. at 464. As to a frisk, the majority recognized "* * * the right to frisk when the situation urgently points to the need of such action for the officer's self-protection." (citations omitted). Id. at 468.
*267 In re State in Interest of D.S., 63 N.J. 541, rev'g on dissenting opinion below, 125 N.J. Super. 278 (App. Div. 1973) also recognizes that in order for highly suspicious circumstances to justify the frisk of an individual such circumstances must include aggravating elements posing a real threat of danger. Cf. State v. Sheffield, 62 N.J. 441, cert. den. 414 U.S. 876, 94 S.Ct. 83, 38 L.Ed.2d 121 (1973). Several cases properly reflect this understanding that a frisk requires the added element of immediate danger. E.g., State v. Lakomy, supra, 126 N.J. Super. at 433 ("* * * aggravated circumstances presenting the strong possibility of some physical danger * * *"); State v. D'Orsi, supra, 113 N.J. Super. at 530 ("reasonable cause to believe" that the suspect is armed); State v. Kennedy, 134 N.J. Super. 454, 459 (App. Div. 1975) ("* * * reasonable cause to believe that his safety was endangered * * *").
The majority comments upon the "volatile mixture" of weapons and violence which poses a danger to society and "* * * a particular threat to the uniformed law enforcement community which is so frequently its target", characterizing this as an "astounding situation" relevant to the constitutionality of the police conduct. Ante at 246. Clearly, such notions, unrooted to particular facts in a given situation, cannot foment a reasonable and fair suspicion that a specific person, here the juvenile, H.B., was likely to be armed and dangerous. Cf. In re State in the Interest of D.S., supra. Not only is there no evidence in the record which portrays H.B. as armed and dangerous, there is none to indicate that the luncheonette in which H.B. was arrested was known to be connected with criminal activity. Compare id. (tavern known as a site for narcotics traffic).
The majority gives its sweeping generalizations as to guns and crime a pseudo-application to this case by saying that "[t]he danger is particularly acute in an urban community such as the City of Newark, where this case arose," Ante at 246 and, referring to crime statistics, that "New Jersey, *268 highly congested with its share of crime and its causes, is no stranger to this national malady." Ante at 246.
The Court's distress and anxiety are understandable. Crime statistics, however, cannot serve to prove in a given case that an individual is the embodiment of that noxious evolution or personifies current crime data. A founded and solid feeling that a person is an armed criminal cannot be predicated simply upon the proposition that crime is rampant in densely populated states and congested cities. Rather it must emanate from specific and articulable facts pointing a straight finger of suspicion at the individual.
It is fundamental that police may proceed forcefully against citizens, to subject them to stop and frisk actions, only upon reliable information or observable conduct sufficient, together or independently, to generate a reasonable suspicion of hostile criminality. Where, as here, intrusive police action is countenanced without such foundations and rationalized only upon an apprehension of crime in general, then every citizen, regardless of personal circumstances, becomes a convenient object of distrust and wariness, a handy target of the police. Such an approach may indeed reduce lawlessness, thwart violence and increase security. But it will accomplish that at the expense of countless numbers of law abiding and blameless people, who will be exposed needlessly to intrusive harassment and the consequent diminution of their personal freedom and individual dignity. We have not, in my view, reached a pass of such critical proportions, demanding these extreme and extraordinary police measures. I would not sanction the abridgement of the Fourth Amendment in the central ward of Newark more readily than anywhere else. This, I believe, the majority has condoned and I must dissent from its holding and reasoning.
Justice PASHMAN and Justice CLIFFORD join in this opinion.
*269 PASHMAN, J., concurring in dissent.
I substantially agree with the well-reasoned analysis of Justice Handler's dissent. However, I feel constrained to note that, where the facts indicate objective evidence of danger to the policeman, I would uphold the validity of a frisk. The circumstances of this case do not square with those of Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) because the danger to the officer was not so clearly evident here. In Terry a policeman of some 39 years experience, 35 of which included walking a beat in the vicinity of the place where the frisk took place, had made careful observations of the suspects before taking action. Only after three men had been observed for ten to twelve minutes engaging in contrivedly causal and oft-repeated reconnaisance of a store window did the officer approach them and identify himself. When they mumbled in response to his inquiries, the officer gave defendant Terry a pat down and felt an object that seemed to be a pistol.
In this case the officer was acting pursuant to an anonymous tip that had been phoned in at headquarters. Aside from the fact that defendant fit, in general non-unique particulars, a description of the armed person mentioned in the tip, he had no reason to believe that defendant was a danger to the patrons of the luncheonette or to himself. Nothing suspicious was going on  defendant was merely sitting at a booth with some young women. There is no indication that any actions of the defendant ever gave the officer any objective, observable cause to fear for his safety. It is also important to note that the officer in this case was accompanied into the luncheonette by his partner.[1] Thus, he had less reason to be fearful than did the lone patrolman in Terry. In addition, the record is bereft of any suggestion that the luncheonette was a "trouble spot" or even that the *270 neighborhood was particularly crime-ridden, factors which might otherwise have enhanced the officer's apprehensions of danger.
While I do not doubt that demanding an extremely detailed description before allowing police to investigate anonymous tips would severely hamper their crime fighting efforts, such a tip, without more, does not provide an unrestricted license automatically to engage in a frisk of a suspect. Even where police are dealing with a known reliable informant, as in Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959), Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1968), or Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), they are required to find some confirmatory evidence before taking action. While these are search and seizure rather than pat down cases, the requirement of some objective supporting evidence to back the tip differs only in degree. The officer must have reason to believe that the person about to be searched is armed and dangerous, and that either he or other persons are in danger of being physically attacked. Terry, 392 U.S. at 27, 88 S.Ct. at 1883, 20 L.Ed.2d at 909.
Moreover, the officer's judgment is not to be measured against a subjective standard, but must reflect that of a "reasonably prudent man in the circumstances." Id. Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), is illustrative of the kinds of factors from which an officer could reasonably infer that his investigation of a suspect carries a discernible physical danger  a risk substantially beyond that faced by any uniformed law officer in normal circumstances. The officer in Adams was alone on patrol in a high crime area at 2:15 A.M. when he was approached by a known informant and told that the person in a nearby car was not only armed but carrying narcotics. When the suspect was approached by the officer and asked to open the car door, he merely rolled down the window. The officer's subsequent reaching into the open window and *271 seizing of a gun from the suspect's waistband was upheld. The officer's belief that the suspect might use a concealed weapon against him was reasonable under the circumstances. And even where these circumstances are present, the officer is entitled to do only what is "minimally necessary to learn whether the [person] were armed and to disarm [him] once he [discovers] the weapons." Terry, 392 U.S. at 30, 88 S.Ct. at 1884, 20 L.Ed.2d at 911. The facts in this case do not establish a similar entitlement to frisk.
Furthermore, the State admitted that tapes were made of each call coming into police headquarters, but that the tape of the tip in this case had been destroyed. While I do not impugn the motives or veracity of the officers in this case, I believe that any doubts which might arise in a situation such as this might easily be avoided by requiring police to retain corroborating evidence for later use at trial. Accordingly, I advocate adoption of a prospective rule requiring police to retain corroborating evidence such as telephone tapes of an anonymous tip. This, of course, should not be taken to mean that police should not take immediate action if they receive a tip which they cannot confirm. For instance, a policeman on patrol who is given a tip by an individual who later cannot be identified may be able to supply the trial judge with other evidence which sufficiently supports the existence of the tip and the accuracy of the information supplied to the officer. See, e.g., Commonwealth v. Anderson, 366 Mass. 394, 318 N.E.2d 834 (Sup. Jud. Ct. 1974); Gaskins v. United States, 262 A.2d 810 (D.C. App. 1970). As pointed out by the dissent, a tip given directly to a police officer has some color of trustworthiness, even if delivered by a person theretofore unknown to him and subsequently unidentifiable. There is present a psychological element of personal accountability wholly lacking where the tip comes from an unknown voice over the telephone.
It should be recognized that even the limited search involved in this case can entail a substantial intrusion into *272 a person's privacy. An individual who is stopped on the street or in a public place and patted down or frisked may be humiliated in front of friends, business associates or relatives. While I recognize that such occurrences may at times be an unfortunate consequence of the violent world in which we live, I am unwilling to increase the chances of having needless searches take place. The prophylactic rule which I have suggested should serve to reduce that possibility, yet leave police free to perform their necessary duties.
Justice HANDLER joins in this opinion.
MOUNTAIN, SULLIVAN and SCHREIBER, JJ., concurring in the result.
For affirmance  Chief Justice HUGHES and Justices MOUNTAIN, SULLIVAN and SCHREIBER  4.
For reversal  Justices PASHMAN, CLIFFORD and HANDLER  3.
NOTES
[1] State v. Deatore, 70 N.J. 100 (1976); State v. Johnson, 68 N.J. 349 (1975); Avant v. Clifford, 67 N.J. 496 (1975); Donaldson v. Board of Ed. of No. Wildwood, 65 N.J. 236 (1974); Rodriguez v. Rosenblatt, 58 N.J. 281 (1971); Monks v. New Jersey State Parole Bd., 58 N.J. 238 (1971); cf. White v. Parole Board, 17 N.J. Super. 580 (App. Div. 1952).
[1] Of course the officers who frisked and arrested the defendant were unaware of the anonymous source of the information that occasioned the investigation.
[1] The partner, Officer Comito, did not testify and his exact whereabouts with respect to Officer Finn's is not clear. However, it is fair to state that Finn's partner, being inside the luncheonette, was clearly near enough to provide support if needed.