251 N.J. Super. 617 (1991)
598 A.2d 1258
STATE OF NEW JERSEY, PLAINTIFF,
v.
BRIAN CARL WILLIAMS A/K/A DANNY SMALLS, DEFENDANT.
Superior Court of New Jersey, Law Division Union County.
Decided September 4, 1991.
*618 Allan Young, for plaintiff (Andrew K. Ruotolo, Jr., Union County Prosecutor, attorney).
Frank Krack, for defendant.
SACHAR, J.S.C.
This is a motion to suppress based on anonymous phone calls to the police concerning a suspicious person with a gun. The court delivered an oral opinion from the bench and indicated that a written opinion would follow.
Officer King, the only officer to testify who was on the scene, stated that "we were given a job, possible man with a gun wearing a red hat doing holdups in the area." He added that in the area of Sixth and Court Streets he "saw approximately four black males standing on the corner. One of the black males had a red hat on." He testified that the area was a residential neighborhood, basically black and hispanic. That it was a high narcotics area and that he had responded to the area numerous times because of drug activities and men with guns. *619 There had been reports of shots fired down there several times. The officer indicated that there were several backup units present and that the four black men were ordered to put their arms against the wall.[1] Defendant was patted down for weapons and the officer felt a hard object in his pocket. A search of the pocket disclosed a nine-inch blade. A search incident to arrest revealed narcotics on defendant. After the arrest, a toy gun was found in the gutter approximately eight feet from defendant.[2]
The court asked to have the dispatcher produced, and the hearing was continued. The propriety of the stop required a remand in State v. Spencer, 221 N.J. Super. 265, 534 A.2d 410 (App.Div. 1987), because of a failure to produce evidence at the suppression hearing with respect to the information possessed by the police department that dispatched the police officer. As stated in Spencer:
The mere fact that Papapietro acted on a report circulated within his department does not mean that he had an articulable and reasonable suspicion. If the information in the hands of the police was mere hunch or rumor or was otherwise insufficient to support an articulable and reasonable suspicion, that information would not justify a stop even though Papapietro relied on it in good faith to stop the car. The reliability of the information is not enhanced simply because it is communicated through police channels. [at 268, 534 A.2d 410]
After hearing the dispatcher and examining the dispatcher's records, the court satisfied itself that there were indeed calls from anonymous tipsters. As the court stated in Commonwealth *620 v. Anderson, 366 Mass. 394, 318 N.E.2d 834 (Sup.Ct. 1974):
It is not unimportant that the message was in writing and was passed on by some disinterested citizen, thus eliminating the possibility of a police fabrication which is a principal concern in assessing the propriety of a threshhold inquiry launched by an anonymous tip. [318 N.E.2d at 838]
The police dispatcher produced two separate cards indicating the first call was received at 11:17 p.m. from an anonymous caller who stated that a man with a gun wearing a red hat, blue jeans and a dark jacket was in the area of 540 Court Street, which is in the area of Sixth and Court Streets. The second call at 11:21 p.m., also from an anonymous caller, was of a suspicious person with a gun located at Sixth and Court Streets. It was the dispatcher's belief that the calls were from two separate women. Separate police cars were dispatched to the scene.
Police, on less than reasonable suspicion, have a right to investigate and ask questions. Citizens have a right to decline to answer such questions:
There is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the streets ... Of course, the person stopped is not obliged to answer, answers may be compelled, and refusal to answer furnishes no basis for an arrest, although it may alert the officer to the need for continued observation. [Terry, supra, 392 U.S. at 34, 88 S.Ct. at 1886, 20 L.Ed.2d at 913 (White, J., concurring)]
Citizens also have the right to walk away:
We conclude that a person has been "seized" within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. [United States v. Mendenhall, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497, 509 (1980), reh'g den. 448 U.S. 908, 100 S.Ct. 3051, 65 L.Ed.2d 1138 (1980)]
Since defendant was not free to leave and was put up against the wall and patted down, he was subject to a Fourth Amendment seizure.
Moreover, it is simply fantastic to urge that such procedure performed in public by a policeman while the citizen stands helpless, perhaps facing a wall with his hands raised, is a "petty indignity." It is a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and it is not to be undertaken lightly .. . We therefore reject the notions that the Fourth Amendment does not come into play at all as a limitation upon police *621 conduct if the officers stop short of something called a `technical arrest' or a `full-blown search.' [Terry, supra, 392 U.S. at 16-19, 88 S.Ct. at 1877-1879, 20 L.Ed.2d at 903-904]
The Fourth Amendment of the United States Constitution provides:
The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized. U.S. Const.Amend. IV.
This inestimable right of personal security belongs as much to the citizen on the streets of our cities as to the homeowner closeted in his study to dispose of his secret affairs. For, as this Court has always recognized, `No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.' [Terry v. Ohio, supra, 392 U.S. at 9, 88 S.Ct. at 1873, 20 L.Ed.2d at 898 (quoting Union Pacific Railroad Company v. Botsford, 141 U.S. 250, 251, 11 S.Ct. 1000, 1001, 35 L.Ed. 734, 737 (1891)]
"What the constitution forbids is not all searches and seizures, but unreasonable searches and seizures." Elkins v. United States, 364 U.S. 206, 222, 80 S.Ct. 1437, 1446, 4 L.Ed.2d 1669, 1680 (1960).
As we have noted on a number of occasions, the Federal and State Constitutions do not bar all searches and seizures. They bar only those that are `unreasonable.' [State v. Kasabucki, 52 N.J. 110, 115, 244 A.2d 101 (1968); see also id. at 115, n. 2, 244 A.2d 101, citing Terry, supra]
While the Fourth Amendment provides that searches and seizures not be unreasonable, one should not thereby conclude that the Supreme Court considers a search and seizure without probable cause as unreasonable in all cases.[3]
The general rule is that seizures and searches must be supported by probable cause. At the same time, the Court has recognized a narrowly defined exception to this general rule. A level of suspicion less than probable cause may justify a search or seizure if the intrusion on Fourth Amendment interests is minimal, and if the minimal intrusion is outweighed by the governmental *622 interests served by the police action. Generally speaking, the Supreme Court has defined a minimally intrusive seizure as one that occurs in public and is brief. See, e.g., Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); United States v. Hensley, 469 U.S. 221, 229, 105 S.Ct. 675, 680, 83 L.Ed.2d 604 (1985). The Supreme Court has assessed the intrusiveness of a search, on the other hand, by considering whether it invades an "expectation of privacy ... that society is prepared to recognize as `reasonable'." Katz [v. United States], 389 U.S. [347] at 361, 88 S.Ct. [507] at 516 [19 L.Ed.2d 576 (1967)] (Harlan, J., concurring). Specifically, the Court has upheld searches conducted on less than probable cause when they occur in certain clearly defined places which by their public nature give rise to reduced expectations of privacy ... The genesis of the Court's two-tier approach is, of course, Terry v. Ohio. [United States v. Winsor, 846 F.2d 1569, 1575-1576 (9 Cir. 1988)]
In Terry, the Court stated "there is no ready test for determining reasonableness other than by balancing the need to search [or seize] against the invasion which the search [or seizure] entails." 392 U.S. at 21, 88 S.Ct. at 1879, 20 L.Ed.2d at 905 (citing Camara v. Municipal Court, 387 U.S. 523, 534-537, 87 S.Ct. 1727, 1733-1735, 18 L.Ed.2d 930, 938-940 (1967)); see also United States v. Montoya De Hernandez, 473 U.S. 531, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985).
The New Jersey Supreme Court said in State v. Dilley, 49 N.J. 460, 231 A.2d 353 (1967), even before the affirmance of Terry by the United States Supreme Court, that:
Freedom and privacy are precious rights which must be zealously guarded for the individual. But without the general security of law and order they would lose their meaning for all. This was fully recognized in the Fourth Amendment which balances the rights of the individual and society and embodies the test of reasonableness. [at 470, 231 A.2d 353]
This balancing approach is not done by the police on a case-by-case approach but is applicable to all Terry stop-and-seizure cases as an exception to the probable cause requirement of the Fourth Amendment.
When we balance the need for a search against its intrusiveness, we usually do so to judge the permissibility of a particular law enforcement practice, not the permissibility of a particular search. Once the Supreme Court has struck the balance, as we believe it has here, it is not our task to reweigh the relevant interests in every case that comes before us. [United States v. Pierre, 932 F.2d 377, 384 (5 Cir.1991)]
And in O'Connor v. Ortega, 480 U.S. 709, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987), Justice Scalia, the crucial fifth vote, admonished *623 the four-justice plurality, that a fact-specific case-by-case approach would plunge courts into a neverending and essentially standardless assessment of every search. Winsor, supra, 846 F.2d at 1578.
To find a reasonable suspicion sufficient to except the seizure from the probable cause requirement of the Fourth Amendment
There must be something at least in the activities of the person being observed or in his surroundings that affirmatively suggests particular criminal activity, completed, current or intended. "... In Terry the police officer judged that his suspect was about to commit a violent crime and that he had to assert himself in order to prevent it." [State v. Saia, 302 So.2d 869, 872 (La.Sup.Ct. 1974)[4]]
In Terry, Officer McFadden of the Cleveland Police Department was patrolling the downtown section in plain clothes when he observed suspicious behavior on the part of two individuals. He saw how one of them would go up to a store, look through its window and return to speak with the other person. This went on for about 10 to 12 minutes. As a result, the officer believed that these two individuals were "casing a job, a stick-up." 392 U.S. at 6, 88 S.Ct. at 1872, 20 L.Ed.2d at 897. He believed that if they were in fact planning to hold up the store, they might have a gun. The officer approached the men and asked for identification and immediately thereafter conducted a "pat-down" of the outer clothing, thereby finding revolvers on each of the two men.
Terry does not involve an anonymous tip. However, it involves the distinction between the police acting on a hunch or an articulable objectively reasonable basis of suspicion. To justify the policeman's stop and search, he "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry, supra, 392 U.S. at 21, 88 S.Ct. at 1880, 20 L.Ed.2d at 906.

*624 The facts must be judged against an "objective standard: would the facts available to the officer at the moment of the seizure ... `warrant a man of reasonable caution in the belief' that the action taken was appropriate?" [Id., 392 U.S. at 21-22, 88 S.Ct. at 1880, 20 L.Ed.2d at 906]
The need to use anonymous phone calls or tips in police investigations has been increasingly recognized over the years. The trend reflects the significant role played by anonymous tips in the detection and prevention of crime, as well as in the resolution of crimes already committed. However, an anonymous tip without more may be no more than a citizen's hunch or an assertion based on rumor, malice or falseness at worst. The court must accordingly evaluate the nature of the tip.
Until 1972, the strongest comment by the United States Supreme Court on the use of anonymous tips came in the form of dicta in Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972).
The Supreme Court in Adams v. Williams addressed whether a known informant's tip can supply the reasonable suspicion necessary for a stop and frisk. In Williams, a known informant approached an officer on patrol and told the officer that a person in a nearby car was carrying narcotics and had a gun at his waist. The officer then approached the vehicle to investigate the informant's information. The officer tapped on the car window and asked the occupant to open the door. When Williams opened the window instead, the officer reached into the car and pulled a loaded pistol from Williams' waistband. The Supreme Court held that the officer's actions complied with the stop and frisk standards enunciated in Terry v. Ohio.

The Williams Court noted that because the informant came forward personally, Williams was a stronger case supporting the use of an informant's tip to justify a Terry stop than the case of an anonymous telephone tip. The Williams Court did not subject the informant's tip to the standard probable cause analysis contained in Aguilar. Instead, the Court stated that the tip carried sufficient "indicia of reliability" to justify the officer's brief intrusion. The Williams Court identified three indicia of reliability surrounding the tip that supplied the reasonable suspicion necessary to justify a forcible stop and frisk. First, the officer knew the informant personally and the informant had provided the officer with information in the past. Second, the informant was subject to criminal prosecution had his tip proved untrue. Finally, the informant came forward personally and gave information that the police officer immediately could verify. [Krancer, "Stop and Frisk Based Upon Anonymous Telephone Tips," 39 Wash. & Lee L.Rev. 1437, 1441-1442 (1972)]
*625 In addition, the informant knew the exact location of the gun and told the police it was in the waist of the suspect.[5] This additional information indicated the extent of the informant's detailed first-hand knowledge and resulted in the Court's not suppressing the evidence. The majority found the facts in Williams presented a stronger case than obtained in the case of an anonymous telephone tip, and the stop and frisk was justified under the circumstances. Williams, supra, 407 U.S. at 146, 92 S.Ct. at 1923, 32 L.Ed.2d at 617-618. However, as the Court stated:
Informant's tips, like all other clues and evidence coming to a policeman on the scene, may vary greatly in their value and reliability. One simple rule will not cover every situation. Some tips, completely lacking in indicia of reliability, would either warrant no police response or require further investigation before a forcible stop on a suspect would be authorized. [Id., 407 U.S. at 147, 92 S.Ct. at 1924, 32 L.Ed.2d at 617-618]
In Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), the Court took a much stronger stand on the issue of anonymous tips than it had in Williams. Until Gates, the courts had been struggling with the application of a two-pronged test established in Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).[6] Stated succinctly, the two-prong test required that, as applied to anonymous tips
Affidavits which relate the testimony of anonymous informants should set forth enough of the underlying circumstances to demonstrate that there is reason to believe both that the informer is a truthful person and that he has based his particular conclusions in the matter at hand on reliable data. Affidavits deficient in either of these respects can establish probable cause only if they provided adequate information to corroborate the informants general reliability and/or particular knowledge. [Rebell, "The Undisclosed Informant and the *626 Fourth Amendment: A Search for Meaningful Standards," 81 Yale L.J. 703, 708 (1972)]
In Gates, supra, the Supreme Court established the totality of the circumstances rule. The Gates case involved determining probable cause based on a search warrant issued by a magistrate with a sworn affidavit. The facts in Gates are as follows: the Bloomingdale, Illinois Police Department received an anonymous handwritten letter stating that a couple by the name of Lance and Sue Gates were involved in a drug distribution scheme, giving a detailed description of their modus operandi. The Court found that:
The letter writer's accurate information as to the travel plans of each of the Gateses was of a character likely obtained only from the Gateses themselves, or from someone familiar with their not entirely ordinary travel plans. [462 U.S. at 245, 103 S.Ct. at 2336, 76 L.Ed.2d at 552]
The officer assigned to the job confirmed everything about the tip except for the drugs themselves. The officer obtained a search warrant for the Gates' residence and their automobile. He executed the warrant after accurately calculating, in accordance with the tip, when the Gates' next buy would take place. Upon execution of the warrant, the Bloomingdale Police uncovered 350 pounds of marijuana in the trunk of the car and in the home found more marijuana, weapons and other contraband.
The lower courts, including the Illinois Supreme Court, found that the anonymous tip did not satisfy the two-prong test and suppressed the evidence seized. The United States Supreme Court agreed, but it concluded that such a result was unwarranted and undesirable.
The strictures that inevitably accompany the `two-pronged test' cannot avoid seriously impeding the task of law enforcement ... If, as the Illinois Supreme Court apparently thought, that test must be rigorously applied in every case, anonymous tips would be of greatly diminished value in police work. Ordinary citizens, like ordinary witnesses, ... generally do not provide extensive recitations of the basis of their everyday observations. Likewise, as the Illinois Supreme Court observed in this case, the veracity of persons supplying anonymous tips is by hypotheses largely unknown, and unknowable. As a result, anonymous tips seldom could survive a rigorous application of either of the Spinelli prongs. Yet, such tips, particularly when supplemented by independent police investigation, frequently contribute to the solution of otherwise *627 perfect crimes. While a conscientious assessment of the bases for crediting such tips is required by the Fourth Amendment, a standard that leaves virtually no place for anonymous citizen informants is not. [462 U.S. at 237-238, 103 S.Ct. at 2332, 76 L.Ed.2d at 547-548]
The Court abandoned the two-prong test and reaffirmed the totality of the circumstances standard established in earlier cases, Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); United States v. Ventresca, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). In doing so, the Court opened the gates to anonymous tips.[7]
On at least two occasions the United States Supreme Court denied certiorari to cases involving anonymous tips. In State v. Jernigan, 377 So.2d 1222 (La.Sup.Ct. 1979), cert. den. 446 U.S. 958, 100 S.Ct. 2930, 64 L.Ed.2d 816 (1980), the Louisiana Supreme Court ruled that an anonymous tip stating that there was a "black male wearing a yellow shirt and blue pants and armed with a handgun ... sitting in Sander's Bar at 4218 Thalia Street in New Orleans," was sufficient grounds for a stop and frisk when coupled with the officer's verification of the description given. Id. at 1224-1225.[8] In his dissent from the United States Supreme Court opinion denying certiorari, Justice White wrote:
We have not directly decided whether an anonymous tip may furnish reasonable suspicion for a stop and frisk. We have emphasized the specificity of the information provided, the independent corroboration by the police officer, and *628 the danger to the public ... but in the decided cases, these factors were not the only indicia of reliability. Arguably, the decision of the Louisiana Supreme Court is inconsistent with our prior cases which require that reasonable suspicion be based on a sufficiently reliable informer's tip. I would grant certiorari for this reason and also because the reliability of an anonymous or unidentified tipster is an issue that has divided the federal courts of appeals. The state courts are similarly divided. [446 U.S. at 959, 100 S.Ct. at 2931, 64 L.Ed.2d at 817 (White, J., dissenting)]
The second case is White v. United States, 648 F.2d 29 (D.C. Cir.), cert. den. 454 U.S. 924, 102 S.Ct. 424, 70 L.Ed.2d 233 (1981), in which Justice White took a similar position as he did in Jernigan, supra. Here, too, the lower court found sufficient articulable suspicion based on an anonymous tip. Although the tip did not concern someone with a weapon, the Court of Appeals for the District of Columbia does give some useful language with respect to Terry searches and anonymous tips:
It is well-recognized that citizen informants in narcotic-ridden neighborhoods want to retain anonymity for fear of retaliation from traffickers. However, the peculiar nature of narcotics crimes means that arrests are almost totally dependent on tips and undercover work; there are no reporting "victims." Therefore, enforcement officials actively encourage such tips from citizens who deplore the effects of drug traffic on their children and their neighborhood. If we are serious about enforcing drug trafficking laws, police must have the ability to reasonably follow-up such anonymous tips through investigation. [White, supra, 648 F.2d at 43-44]
The United States Supreme Court in Alabama v. White, 496 U.S. ___, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990), finally granted certiorari in an anonymous tip case. In an opinion by Justice White, the Court confirmed "that an anonymous tip may furnish reasonable articulable suspicion for an investigatory stop under Terry." Allen v. State, 85 Md. App. 657, 584 A.2d 1279, 1282 (1991). The facts in White are as follows:
In White, police corroborated the informant's predictions that a woman would leave a particular apartment building within a particular time frame, get into a particular automobile, and drive to a particular location. When the woman had nearly reached the predicted destination, the police stopped her. The Supreme Court noted that, although the route taken by the woman was the most direct, the route involved several turns. The Supreme Court stated that the "respondent's destination was significantly corroborated." Id., 110 S.Ct. at 2417. The Supreme Court upheld the stop, noting that it was a "close case." The Supreme Court ultimately was persuaded by the informant's ability to predict "future behavior [i.e., the time and place of departure, the car to be utilized, *629 and the destination] because it demonstrated inside information  a special familiarity with respondent's affairs." [Commonwealth v. Lyons, 406 Mass. 16, 564 N.E.2d 390, 393, n. 5 (Sup.Ct. 1990)]
With respect to the lack of reliability inherent in an anonymous tip, the Court stated:
Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability. Both factors  quantity and quality  are considered in the "totality of the circumstances  the whole picture," United States v. Cortez, 449 U.S. 411, 417, 66 L.Ed.2d 621, 101 S.Ct. 690 [695] (1981), that must be taken into account when evaluating whether there is reasonable suspicion. Thus, if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable. [White, supra, 496 U.S. at ___, 110 S.Ct. at 2416, 110 L.Ed.2d at 309]
In State v. Novembrino, 105 N.J. 95, 519 A.2d 820 (1987), our Supreme Court analyzed the weight to be afforded to an informant's tip. The informant, though unidentified in the affidavit submitted by the police to the judge as the basis for establishment of probable cause, stated that the informant had previously supplied information which was reliable in several investigations. The New Jersey Supreme Court held that the affidavit lacked a showing of probable cause even though the two prongs of the Aguilar-Spinelli analysis were satisfied, and that the warrant was improperly issued. With respect to the use of hearsay in establishing probable cause, the Court stated:
Like the federal courts, we have permitted reliance on hearsay for the purpose of establishing probable cause, but have insisted that the officer's affidavit provide the warrant-issuing judge with a substantial basis for crediting the hearsay. [Novembrino, supra at 120-121, 519 A.2d 820]
With reference to Gates and the totality of the circumstances test, the Court stated:
As the majority in Gates conceded, search warrant applications that rely in part on an informant's tip will continue to require thorough scrutiny of the informant's veracity and basis of knowledge in the context of the totality of the facts contained in the officer's showing of probable cause. Illinois v. Gates, supra, 462 U.S. at 238-239, 103 S.Ct. at 2332, 76 L.Ed.2d at 548. We would also note, as illustrated by the affidavit in this case, that the Aguilar-Spinelli analysis  useful though it may be in assessing the weight to be accorded to an informant's tip  does not necessarily end the inquiry as to an affidavit's *630 sufficiency in establishing probable cause. [Novembrino, supra at 123, 519 A.2d 820]
The Court then applied the totality of the circumstances test, concluding that:
Read together, the allegations of the informant and of the officers did not provide the issuing judge with sufficient facts on which to base an independent determination as to the existence of probable cause. [Id. at 128, 519 A.2d 820]
It would appear that under the Novembrino analysis the adoption of Gates in New Jersey does not entirely abandon the Aguilar analysis. See also White v. State, 550 So.2d 1074 (Ala.Cr.App. 1989), rev'd 496 U.S. ___, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990), applying a similar Gates-Aguilar analysis to a Terry stop situation.
The past reliability of the police informant in Novembrino overcame the inherent untrustworthiness of a police informant's testimony. There is a difference in reliability between a police informant and a citizen informer.
The Wisconsin Supreme Court in State v. Paszek, 50 Wis.2d 619, 184 N.W.2d 836, 842 (1971), explained the rationale behind this distinction: A different rationale exists for establishing the reliability of named "citizen-informers" as opposed to the traditional idea of unnamed police contacts or informers who usually themselves are criminals. Information supplied to officers by the traditional police informer is not given in the spirit of a concerned citizen, but often is given in exchange for some concession, payment, or simply out of revenge against the subject. The nature of these persons and the information which they supply convey a certain impression of unreliability, and it is proper to demand that some evidence of their credibility and reliability be shown. One practical way of making such a showing is to point to accurate information which they have supplied in the past. [State v. Lakomy, 126 N.J. Super. 430, 435, 315 A.2d 46 (App.Div. 1974)]
In contrast, the citizen informer is presumed to be inherently trustworthy:
When information is provided by a cooperative citizen, or an informant not from the criminal milieu, there is less need for establishing credibility of the informant. An ordinary citizen who reports a crime has been committed in his presence stands on a much different ground than a police informer. He is a witness to a crime who acts with an intent to aid the police in law enforcement because of his concern for society. He does not expect any gain or concession in exchange for his information. A citizen-informer of this type usually would not have more than one opportunity to supply information to the police, thereby precluding proof of his reliability by pointing to previous accurate information *631 which he had supplied. We hold that when information is provided by a citizen-informer his prior reliability need not be established as a prerequisite for issuance of a search warrant. [State v. Kurland, 130 N.J. Super. 110, 114-115, 325 A.2d 714 (App.Div. 1974)]
The court in State v. Gagen, 162 N.J. Super. 105, 392 A.2d 239 (App.Div. 1978), stated:
It will be noted that the tenor of this quotation indicates that it is assumed that the citizen-informer (at least in nonfrisk cases) had personal knowledge as distinguished from rumor or hearsay as to the information supplied to the police. Hence, in Kurland the police were held to have justifiably acted on a warrant procured through information supplied by a citizen-informer who was an "eye-witness to the robbery." ... In sum, in order for the information supplied by a citizen-informer to be sufficient for the finding of probable cause to make a warrantless search, all other requirements being present, it must appear that the informer's information was obtained from personal observation or knowledge, or there must be some reasonable verification thereof. [at 111-113, 392 A.2d 239[9]]
A citizen informer is a known citizen and not just merely a citizen whose identity is not known. This is brought out in State v. Williams, 168 N.J. Super. 352, 403 A.2d 28 (App.Div. 1979), where in discussing Lakomy and its progenies, the court stated:
We understand the import of these cases to be that the indicia of an informant's trustworthiness necessary to support a finding of probable cause may be found when the information relied on has been supplied by an ordinary citizen witness who is not a traditional police informer and whose identity, though not furnished to the issuing judge, is known to the police. This principle is inapplicable, whereas here, the informant has intentionally withheld his identity and no other evidence is at hand to verify his reliability. [Williams, supra at 357, 403 A.2d 28]
*632 In State v. Royal, 115 N.J. Super. 439, 280 A.2d 201 (App.Div. 1971), the police received a call from an anonymous informant who stated that narcotics were being used at a specific address in Newark. The police went to the house and identified themselves as police but did not indicate the purpose of their visit or what information they had obtained to the person who opened the door. The person who opened the door and others fled inside the house while others left the rear of the house and fled over a fence in a rear yard. Defendant Royal was seen by police as he ran through the front hallway and up the stairs to a bedroom. The fleeing persons' actions was considered to be sufficient corroboration to establish probable cause.
In Williams, supra, an anonymous phone call informed the police that shoes were being stolen from a named warehouse.
The caller, evidently observing the theft in progress, physically described the van being used in the crime together with its license plate number and stated that it would be driven out of the lot at about 3 p.m. [168 N.J. Super. at 355, 403 A.2d 28]
The police entered the warehouse and corroborated the van's description and from having investigated other thefts at the same warehouse understood that the cargo consisted of large shoe cartons. The court found that probable cause existed based on this corroboration aforementioned at the warehouse. Id. at 357, 403 A.2d 28.[10]
State v. Ransom, 169 N.J. Super. 511, 405 A.2d 411 (App.Div. 1979), deals with a police informant with information that defendants were dealing cocaine from their tavern. The court found that:
Irrespective of whether the police had corroboration or verification of the information provided by the informant, it is abundantly clear to us that there is readily demonstrated here "the underlying circumstances from which the informer" arrived at the conclusions he imparted to the police ... The fact that the hearsay of an informer's statement is uncorroborated is not enough to *633 defeat probable cause. Other sufficient reasons for crediting the out-of-court statement, as here, will do. [at 519, 405 A.2d 411]
What basically sustained the informant's testimony in Ransom was that "engagingly credible testimony demonstrates beyond cavil (a) the personal nature of the knowledge which the informer had...." Id. at 518, 405 A.2d 411.
In assessing the level of suspicion to establish probable cause, the courts have emphasized the flexible nature of the standard. For example, in United States v. Chaidez, 919 F.2d 1193, 1199 (7 Cir.1990), the court states:
"Probable cause" is a flexible idea, responding to (among other things) the gravity of the offense, and hence the need for thorough investigation. [Llaguno v. Mingey, 763 F.2d 1560, 1566 (7 Cir.1985) (in banc)]
And in State v. Kasabucki, 52 N.J. 110, 244 A.2d 101 (1968), the Court states that
Probable cause is a flexible, nontechnical concept. It includes a conscious balancing of the governmental need for enforcement of the criminal law against the citizens' constitutionally protected right of privacy. It must be regarded as representing an effort to accommodate those often competing interests so as to serve them both in a practical fashion without unduly hampering the one or unreasonably impairing the significant content of the other. State v. Davis, supra, 50 N.J. at p. 24 [231 A.2d 793]. Thus, although incapable of precise definition, the term has been construed to signify less evidence than would be required to establish guilt of the crime for which the warrant is sought. Brinegar v. United States, 338 U.S. 160, 173-176, 69 S.Ct. 1302 [1309-1311], 93 L.Ed. 1879, 1889-1890 (1949). It means something more than "raw unsupported suspicion." It is a suspicion of guilt that is well-grounded; a reasonable basis for a belief that a crime has been or is being committed. [at 116-117, 244 A.2d 101]
In State v. Davis, 50 N.J. 16, 231 A.2d 793 (1967), the definition of "suspicion" is referred to as follows:
The word "suspicion" or "suspect" is commonly used in the definition of probable cause. See 4 Blackstone, Commentaries 292; 5 Am.Jur.2d, Arrest § 44, p. 735; Jackson v. Knowlton, 173 Mass. 94, 53 N.E. 134, 135 (Sup.Jud.Ct. 1899). In other settings "suspicion" may rest upon nothing more than imagination, but as to probable cause, suspicion must arise out of reasonable grounds in the facts and circumstances, and hence it either equals or results in a "belief" of guilt. In this context "suspect" and "believe" are substantial equivalents. De Salvatore v. State, 2 Storey 550, 52 Del. 550, 163 A.2d 244, 249 (Sup.Ct. 1960). [at 23, n. 3, 231 A.2d 793]
*634 Having examined cases dealing with police informants, citizen informers, and anonymous callers in establishing probable cause, what lesser proofs suffice for a Terry stop?
In United States v. Sokolow, 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989), the Court discussed, among other things, the quantum of evidence necessary for a Terry stop.
That level of suspicion is considerably less than proof of wrongdoing by a preponderance of evidence. We have held that probable cause means `a fair probability that contraband as evidence of crime will be found' ... and the level of suspicion required for a Terry stop is obviously less demanding than that for probable cause. [490 U.S. at 7, 109 S.Ct. at 1585, 104 L.Ed.2d at 10]
The seminal Terry stop and frisk case dealing with an anonymous tip of a man with a gun in New Jersey is State in Interest of H.B., 75 N.J. 243, 381 A.2d 759 (1977). In H.B., police officers were dispatched to a luncheonette to investigate "a black individual wearing a black hat, black leather coat and checkered pants ... with a gun in his possession." Id. at 248, 381 A.2d 759. The Court in a four to three plurality decision assumed that the tip came from an anonymous source and that there was no suspicious behavior by defendant. The Court upheld the patdown after the balancing of constitutional imperatives enunciated in Terry. Id. at 252, 381 A.2d 759.[11]
*635 In H.B., the court found that "the description therein of H.B.'s person and clothing was found to be precisely accurate; that none other of the 15 males in the luncheonette was similarly dressed or `fitted the description'." Id. at 248, 381 A.2d 759.
The Court later stated with respect to the description that:
There is some verification factor in the very accuracy of the informer's description. Although the informer in Draper v. United States, 358 U.S. 307, 309, 79 S.Ct. 329, 331, 3 L.Ed.2d 327, 330 (1959), was known and reliable, the Court attached significance to the appearance, at the place predicted, of a "person, having the exact physical attributes and wearing the precise clothing described." [Id. at 249, 381 A.2d 759]
The Court in Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959) stated:
[He] saw a man, having the exact physical attributes and wearing the precise clothing and carrying the tan zipper bag that Hereford had described, alight from one of the very trains from the very place stated by Hereford and start to walk at a "fast" pace toward the station exit, Marsh had personally verified every facet of the information given him by Hereford except whether petitioner had accomplished his mission and had the three ounces of heroin on his person or in his bag. [358 U.S. at 315, 79 S.Ct. at 334, 3 L.Ed.2d at 332]
The Court distinguished the facts in H.B. from the facts in People v. La Pene, 40 N.Y.2d 210, 386 N.Y.S.2d 375, 352 N.E.2d 562 (1976) and People v. Wynn, 54 A.D.2d 366, 388 N.Y.S.2d 922 (App.Div. 1976) stating that:
The "precipitate frisk" in La Pene was based on information "couched in vague and general terms" (black man in red shirt); no attempt was made to ascertain whether others present fit this description; and the court specifically found no "exigency" justifying a limited protective frisk. In Wynn also the information was ambiguous, concerning a man walking on the street "possibly armed with a gun," there being "no report that the man had a gun."[12] 388 N.Y.S.2d at 925. [H.B., supra, 75 N.J. at 250, 381 A.2d 759]
In addition to the objective, articulable facts provided in the description and place where defendant was found, the facts and circumstances of the danger posed to the public and police *636 officer were additional factors explicitly referred to as a basis for the court's conclusion in H.B.
... Officer Finn, and presumably his partner, were in full uniform when they entered the premises. We regard this last fact as highly significant to the reasonableness of the conduct of the officers, in view of their exposure to risk in this somewhat crowded place, from a supposed "man with a gun."[13] [Id. at 249, 381 A.2d 759]
The court held that in view of the danger that handguns present to society, that New Jersey, in the circumstances presented in H.B. would not go "beyond naked constitutional rights as defined by the United States Supreme Court." Id. at 252, 381 A.2d 759.
The court indicated the officers would have been derelict in their duty had they not made such a limited weapon search.[14]
Naked constitutional rights as defined by the United States Supreme Court require as a prerequisite that the tip distinguish the suspect from citizens in general. "If the underlying facts fail to reasonably distinguish [the suspected individual] from any other citizen ... at that time and place, the detention is not justified." People v. Bower, 24 Cal.3d 638, 156 Cal. Rptr. 856, 859, 597 P.2d 115, 118 (1979) (quoting People v. Moore, 69 Cal.2d 674, 683, 72 Cal. Rptr. 800, 806, 446 P.2d 800, 806 (1968)).
*637 The Fourth Amendment requirement of a particularized description of the person for the issuance of a warrant, "expresses the policy against generality at which the Amendment was primarily directed." R.M. Leagre, "The Fourth Amendment and the Law of Arrest," 54 J.Crim.L. & Criminology 393, 412 (1963).
On the high-end of the scale of reliability of the facts set forth in an anonymous tip is sufficient particularity to indicate personal knowledge based on eyewitness reliability.
Adequate indicia of reliability of anonymous tips may arise from the very specificity of the information given respecting the individual suspect, since detailed descriptive characteristics of the person, including the clothes he is wearing, when corroborated by the officers who shortly thereafter find an individual in the given spot or area exactly fitting the description, strongly indicate that the information is based on personal observation of the informant. There is some verification factor in the very accuracy of the informant's description. State v. Hasenbank, 425 A.2d 1330, 1333 (Me.Sup.Ct. 1981).
Where the call is contemporaneous with the police confirmation of the report, see Lawson [v. United States,] supra, at 40, and reports a rapidly moving street occurrence involving contraband, it is reasonable to conclude that the citizen informant has eyewitness reliability. [Henighan v. United States, 433 A.2d 1059, 1064 (D.C. 1981); emphasis supplied]
Two Commonwealth v. Anderson cases are illustrative of general descriptions and the fact that an individual is alleged by an anonymous tipster to be in possession of a gun may well tip the scale in favor of sustaining the Terry stop and patdown. In Commonwealth v. Anderson, 481 Pa. 292, 392 A.2d 1298 (Sup.Ct. 1978), an anonymous informant described the suspect who was an escapee from a drug rehabilitation program as "a Negro male, named `Perry' about 5'10" with a large `bush' hair style and wearing a dark coat." He was said to be at the Capri Bar. The suspect gave a false name when approached by the officers. However, the police had no way of verifying whether it was false at the time. The court, in suppressing the evidence, stated that "only a general description was given, one which would fit any number of individuals" and there was no information that he was armed or dangerous. 392 A.2d at 1299-1300.

*638 Because of the general nature of the description it cannot be argued that the tip was corroborated by the appellant's presence in the bar. Moreover, there was nothing observable in his conduct in the officers' presence to suggest that he was in anyway involved in criminal activity or that he was the person they were seeking. In fact the only basis for the officers' belief that a crime had occurred rested upon unverified information supplied by the unidentified informer. Even though the intrusion here may be termed modest, we do not believe that the officers here possessed a reasonable suspicion to justify the "stop." [Id. 392 A.2d at 1301]
In Commonwealth v. Anderson, 366 Mass. 394, 318 N.E.2d 834 (Sup.Ct. 1974), where there was a general description of a black male wearing a blue hat reported by the tipster to be carrying a brown paper bag with narcotics, the information included that the suspect was armed and dangerous. The court denied the motion to suppress and found "the inference could be drawn from the note that the informant was on the same bus as the defendant and very probably based his information on personal observations." Id. 318 N.E.2d at 838.
A Terry stop does not necessarily involve violent criminal activity, and accordingly, does not automatically validate a Terry patdown.
The search is judged by whether a reasonably prudent person would be warranted in the belief that his or her safety or that of others was in danger. [Referring to State v. Thomas, 110 N.J. 673, 685, 542 A.2d 912 (1988)]. That reasonableness is to be measured by an objective standard. More than subjective impressions are required. [State v. Lund, 119 N.J. 35, 45, 573 A.2d 1376 (1990)]
However, as the Court in Lund, supra, thereafter noted:
In some instances the right to conduct a protective search flows directly from the basis for the investigatory stop. We quoted Justice Harlan in his concurring opinion in Terry, who stated that "the right to frisk must be immediate and automatic if the reason for the stop is, as here, an articulable suspicion of a crime of violence." [Thomas,] 110 N.J. at 680, 542 A.2d 912 (quoting Terry, supra, 392 U.S. at 33 [88 S.Ct. at 1886, 20 L.Ed.2d at 913). In addition, courts are more likely to approve of "automatic" protective searches when officers, before they even approach the suspect, have a specific and objectively credible reason to believe the suspect is armed. See Adams v. Williams, 407 U.S. 143 [92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) (upholding protective search based on an *639 informant's tip that suspect seated in car was carrying narcotics and had a "gun at his waist."). [Lund, supra at 45-46, 573 A.2d 1376][15]
State v. Thomas, 110 N.J. 673, 542 A.2d 912 (1988), allowed a Terry stop but not a pat down for a person alleged by an anonymous tipster to be in possession of narcotics. The Court stated, in dictum, that it would have been a stronger case for a pat down if the tipster had indicated that defendant had a gun. The Court cited H.B., supra, as holding that a corroborated tip relating to an armed suspect from an anonymous informant can provide the basis for a stop.
The veracity of the tip was corroborated by Officer Williams when he entered the bar. Defendant was the only person matching the description, and Officer Williams also recognized him from a prior arrest for drug possession. [110 N.J. at 683, 542 A.2d 912]
The description was "a man named Ike, dressed in a plaid cap, tan jacket, and wearing gold frame glasses...." Id. at 675, 542 A.2d 912. Under the facts of the case, the Court held that possession of CDS was not sufficient to suspect defendant "of the violent criminal activity that would justify an `automatic' search." Id. at 684, 542 A.2d 912. For the Court in H.B. indicated:
By the same token, we intend our decision here, justifying a protective frisk, to be narrow enough to be understood as comprehending only such lethal material, vis-a-vis gambling paraphernalia or narcotic contraband, for instance, although they too would evidence criminal activity. We would not include in the thrust of this opinion material such as the glassine envelopes containing heroin which were discovered in the search dealt with in In re State in the Interest of D.S., 63 N.J. 541 [310 A.2d 460] (1973) ... To the end of such emphasis we repeat and *640 adopt the language of the Appellate Division: "[T]he principles applied herein are viable only in cases where the frisk or search is essential for the protection of life and limb of the police officer and exposed members of the public. It is this present danger which cloaks such police action with the reasonableness required by the Fourth Amendment." [75 N.J. at 251-252, 381 A.2d 759]
The Court in Thomas, however, added the caveat that
we adopt no hard and fast rule that suspicion of illegal drug possession never can form the basis for a protective search of a suspect. We concur with Judge Friendly's warning that "courts should not set the test of sufficient suspicion that the individual is `armed and presently dangerous' too high when protection of the investigating officer is at stake." [110 N.J. at 685, 542 A.2d 912 (quoting United States v. Riggs, 474 F.2d 699, 705 (2 Cir.1973))]
With respect to the case at bar, the court makes the following findings: There were two calls that the police received from two separate persons. Both calls were received prior to the Terry stop. According to the testimony and the dispatcher's card, the first call was received at 11:17 p.m. and was assigned at 11:19 p.m. The other call came at 11:21 p.m. and was assigned at the same time so that there is no question but that the pat down did not occur until after the second call was received by the police. As cited in the landmark case of Whitely v. Warden Wyoming State Penitentiary, 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1970), collective knowledge of the police force is sufficient to support probable cause, or in this case reasonable suspicion.
The description given by the first caller was of a man with a gun, wearing a red hat, blue jeans and a dark jacket in the area of 540 Court Street. The second call described a suspicious person with a gun located at Sixth and Court Streets. Taken together with the second call, the court finds that the calls from two different sources indicate eyewitness observation from persons in the neighborhood. In short, the sum is greater than its parts.
"Where information from different sources dovetails, corroboration exists." State v. Kimbro, 197 Conn. 219, 496 A.2d 498, 505 (Sup.Ct. 1985), (citing State v. Jackson, 162 Conn. 440, 448, 294 A.2d 517 (Sup.Ct. 1972), cert. den. 409 U.S. 870, 93 S.Ct. 198, 34 L.Ed.2d 121 (1972)).
*641 When three unreliable but unconnected persons all report the same fact, it is probable that the fact is true. United States v. Hyde, 574 F.2d 856, 863 (5 Cir.1978).
While the police testimony did not verify the dress other than that defendant was wearing a red hat, "no evidence has been presented that shows a disparity between the description given by the victim to police and the description that formed part of the basis for the reasonable suspicion to stop defendant." State v. Reynolds, 124 N.J. 559, 569, 592 A.2d 194, 199 (1991).
The event occurred at 11:17 at night. While defendant was in the company of three other men engaged in no apparent suspicious activities when observed by the police, it was a high crime neighborhood where shootings were personally known to the officer to have taken place in the past. The fact that a certain area or neighborhood is "notorious for its drug activities [and] shootings ... is a factor that may be considered in the totality of the circumstances." Allen v. State, 85 Md. App. 657, 584 A.2d 1279 (1991); see also State v. Demeter, 124 N.J. 374, 385, 590 A.2d 1179 (1991).
Based on the totality of the circumstances, the court finds that there were sufficient articulable facts available to the officer at the moment of seizure to warrant a man of reasonable caution in the belief that the action taken was appropriate. See Terry, supra, 392 U.S. at 22, 88 S.Ct. at 1880, 20 L.Ed.2d at 906. There being sufficient grounds for a Terry stop to investigate for the unlawful possession of a weapon, the patdown was warranted as "[t]he Constitution does not require an officer to wager his physical safety against the odds that a suspected assailant is actually unarmed." State v. Dennis, 113 N.J. Super. 292, 297, 273 A.2d 612 (App.Div. 1971), certif. den. 58 N.J. 337, 277 A.2d 394 (1971).
Defendant's motion to suppress is accordingly denied.
NOTES
[1] See United States v. Berryhill, 445 F.2d 1189, 1193 (9 Cir.1971) (All companions of arrestee within immediate vicinity, capable of accomplishing a harmful assault on officer, may be constitutionally subjected to a cursory "pat down" reasonably necessary to give assurance that they are unarmed.)
[2] Facts not known at the time of the seizure cannot be used to validate the actions of the police. See State v. Hutchins, 43 N.J. 85, 202 A.2d 678 (1964); Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); United States v. Martinez-Fuerte, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976); Terry v. Ohio, 392 U.S. 1, 22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889, 906 (1968); Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959).
[3] For a compendium of New Jersey and federal decisions where reasonableness is held to be based on less than probable cause, see Allen v. Passaic County, 219 N.J. Super. 352, 530 A.2d 371 (Law Div. 1986); United States v. Chaidez, 919 F.2d 1193, 1196-1197 (7 Cir.1990); United States v. Winsor, 846 F.2d 1569, 1577-1578 (9 Cir.1988).
[4] See also, in accord, State v. Davis, 104 N.J. 490, 504, 517 A.2d 859 (1986) as to New Jersey law and United States v. Cortez, 449 U.S. 411, 417, 101 S.Ct. 690, 694, 66 L.Ed.2d 621, 628 (1981).
[5] See Henighan v. United States, 433 A.2d 1059 (D.C. 1981) applying a gender neutral argument to justify a Terry search of a woman's purse for weapons allegedly analagous to search of a man's waistband for a gun in Williams. See also Commonwealth v. Davidson, 389 Pa.Super. 166, 566 A.2d 897 (1989).
[6] See "Anonymous Tips, Corroboration and Probable Cause: Reconciling the Spinelli/Draper Dichotomy in Illinois v. Gates," 20 Am.Crim.L.Rev. 99 (1982).
[7] The following states have declined to follow the totality of the circumstances standard adopted in Gates, supra: Alaska: Kvasnikoff v. State, 804 P.2d 1302 (Alaska Ct. App. 1991); California: People v. Gonzalez, 51 Cal.3d 1179, 275 Cal. Rptr. 729, 800 P.2d 1159 (Sup.Ct. 1990); Massachusetts: Commonwealth v. Lyons, 406 Mass. 16, 564 N.E.2d 390 (Sup.Ct. 1990); New Mexico: State v. Cordova, 109 N.M. 211, 784 P.2d 30 (Sup.Ct. 1989), State v. Therrien, 110 N.M. 261, 794 P.2d 735 (App.Ct. 1990); New York: People v. Vilardi, 76 N.Y.2d 67, 556 N.Y.S.2d 518, 555 N.E.2d 915 (Sup.Ct. 1990); Tennessee: State v. Coleman, 791 S.W.2d 504 (Tenn. Crim. App. 1989); Washington: State v. Jackson, 102 Wash.2d 432, 688 P.2d 136 (Sup. 1984).
[8] For a compendium of cases, pro and con on stop and frisk based on anonymous tips, see Jernigan, supra at 1225, n. 3.
[9] A combination of tips from an informant and first-hand corroborative observation of suspicious activity will provide probable cause for an arrest. See Alabama v. White, 496 U.S. ___, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990) (anonymous informant and Terry stop); Gates, supra, (anonymous informant and probable cause to search); United States v. Chavez, 902 F.2d 259 (4 Cir.1990) (confidential informant and probable cause to search); United States v. Porter, 738 F.2d 622 (4 Cir.1984) (anonymous informant and Terry stop); United States v. Shepherd, 714 F.2d 316 (4 Cir.1983), cert. den. 466 U.S. 938, 104 S.Ct. 1914, 80 L.Ed.2d 462 (1984) (confidential informant and probable cause to arrest); United States v. McCraw, 920 F.2d 224, 227 (4 Cir.1990).
[10] But it suppressed the evidence because the police delayed until 4:30 p.m. for more than four hours during which time the court found that the police had ample time to secure a search warrant and that it was therefore a police created exigency.
[11] The following cases are in accord with and cite State in Interest of H.B.: Florida: State v. Hetland, 366 So.2d 831 (Fla. Dist. Ct. App. 1979); Louisiana: State v. Jernigan, 377 So.2d 1222 (La.Sup.Ct. 1979), cert. den. 446 U.S. 958, 100 S.Ct. 2930, 64 L.Ed.2d 816 (1980); Maine: State v. Hasenbank, 425 A.2d 1330 (Me.Sup.Ct. 1981); Maryland: Johnson v. State, 50 Md. App. 584, 439 A.2d 607 (1982); Watkins v. State, 288 Md. 597, 420 A.2d 270 (Sup.Ct. 1980); Massassachusetts: Commonwealth v. McCauley, 11 Mass. App. Ct. 780, 419 N.E.2d 1072 (1981); Washington: State v. Franklin, 41 Wash. App. 409, 704 P.2d 666 (1985); and though not citing H.B., the following additional states are in accord with H.B.: District of Columbia: Lawson v. United States, 360 A.2d 38 (D.C.App.Ct. 1976); Hawaii: State v. Kuahuia, 62 Hawaii 464, 616 P.2d 1374 (Sup.Ct. 1980); Kentucky: Graham v. Commonwealth, 667 S.W.2d 697 (Ky. Ct. App. 1983) (discretionary review denied 1984); Michigan: People v. Tooks, 403 Mich. 568, 271 N.W.2d 503 (Sup.Ct. 1978); Virginia: Hardy v. Commonwealth, 11 Va. App. 433, 399 S.E.2d 27 (1990).
[12] It should be noted, however, that New York is one of a small number of states which has continued to adhere to the Aguilar-Spinelli test, and reject the Gates "totality of the circumstances" test, with regard to the evaluation of anonymous tips. See supra n. 7.
[13] The Court also refered to People v. Taggart, 20 N.Y.2d 335, 283 N.Y.S.2d 1, 229 N.E.2d 581 (Sup.Ct. 1967), app.dism. 392 U.S. 667, 88 S.Ct. 2317, 20 L.Ed.2d 1360 (1968). In Taggart, the anonymous caller stated that a specifically described person was at a certain place and that he had a loaded revolver in his pocket. The suspect was found at the named location in the midst of a group of children which the court concluded justified a search for the weapon.
[14] The language of dereliction of duty for failure to act is found in State v. Hetzko, 283 So.2d 49, 52 (Fla. Dist. Ct. App. 1973) and as the court therein noted, dealt with "the right of police to enter and investigate [private property] in an emergency, without an accompanying intent either to seize or arrest [which is] inherent in the very nature of their duties as peace officers and derives from the common law." Id. at 51. See also State v. Wright, 213 N.J. Super. 291, 517 A.2d 171 (App.Div. 1986) regarding the emergency doctrine.
[15] "[W]e have noted that ... creative judge[s], engaged in post hoc evaluation[s] of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished." United States v. Sharpe, 470 U.S. 675, 686-687, 105 S.Ct. 1568, 1575-1576, 84 L.Ed.2d 605, 616 (1985). But `[t]he fact that the protection of the public might, in the abstract, have been accomplished by `less intrusive' means does not, in itself, render the search unreasonable.' 470 U.S. at 687, 105 S.Ct. at 1576, 84 L.Ed.2d at 616, citing Cady v. Dombrowski, 413 U.S. 433, 447, 93 S.Ct. 2523, 2531, 37 L.Ed.2d 706 (1973). Authorities must be allowed `to graduate their response to the demands of any particular situation.' United States v. Place, 462 U.S. 696, 709, n. 10, 103 S.Ct. 2637, 2646, n. 10, 77 L.Ed.2d 110, 122 (1983). Sokolow, supra, 490 U.S. at 11, 109 S.Ct. at 1587, 104 L.Ed.2d at 12.